UNITED STATES v. FIFTY–NINE TUBES, MORE OR LESS, OF LUTEIN TABLETS (HYNSON, WESTCOTT & DUNNING, Inc., Claimant).

SAME v. SIX BOXES, MORE OR LESS, EACH CONTAINING ONE DOZEN TUBES OF LUTEIN TABLETS (HYNSON, WESTCOTT & DUNNING, Inc., Claimant).

District Court, S. D. New York.
May 7, 1940.

John T. Cahill, U. S. Atty., of New York City (George B. Schoonmaker, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Cravath, deGersdorff, Swaine & Wood, of New York City (Albert R. Connelly and Harold R. Medina, Jr., both of New York City, and Vernon Cook, of Baltimore, Md., of counsel), for claimant.

WOOLSEY, District Judge.

My judgment in this cause is that the libels should be dismissed, without costs, for the reasons hereinafter indicated.

I. My subject matter jurisdiction is found in the provisions of the Pure Food and Drugs Act of 1906, Section 10, Title 21 United States Code, Section 14, 21 U.S.C.A. § 14.

As this is a proceeding in rem and the tablets here in question were seized in this district on September 14, 1938, and January 3, 1939, there can be no question of venue.

The claimant, Hynson, Westcott & Dunning, Inc., is a manufacturer of drugs at Baltimore, Maryland. The tablets which were seized on the above dates had been shipped by it from its Baltimore factory to its New York office in this district.

II. The libels brought in this cause by the United States have two branches.

The first branch is based on a claim of *adulteration* of the seized lutein tablets, under the second sub-division of Section 7 of the Pure Food and Drugs Act of 1906. Title 21 United States Code, Section 8, 21 U.S.C.A. § 8.

The second branch is based on a claim of *misbranding* of the said tablets, under Section 8 of the said Act. Title 21 United States Code, Section 9, 21 U.S.C.A. § 9.

III. Title 21 United States Code, Section 8, 21 U.S.C.A., § 8, reads, so far as here relevant, as follows:

"Sec. 8. Adulterated articles. For the purposes of sections 1 to 15, inclusive,

of this title, an article shall be deemed to be adulterated;

"Drugs. In case of drugs:

\* \* \*

"*Below professed standard.*—Second. If its strength or purity fall below the professed standard or quality under which it is sold."

A. The labels on the bottles were changed between the first and the second seizure, as were also the physician's card which the detail men or salesmen furnished to physicians to be put in their card catalogues or files.

The label on the bottles which were the subject of the first seizure is marked Exhibit 1, and reads as follows:

B. The label on the bottles at the time of the second seizure was *in pari materia* with that in the first seizure, but slightly changed in its reading, as shown by Exhibit 2, which reads as follows:

C. On the issue of adulteration, one may look not only at the labels on the bottles, but also at any other documents which accompany the product by way of advertisements or description by the manufacturers.

In the present instance there was, in addition to the labels, the so-called physician's card of a size and shape to be conveniently put into a card catalogue or file.

The physician's card issued at the time of the first seizure was marked Exhibit 3, and the physician's card issued at the time of the second seizure was marked Exhibit 4.

In addition to the physician's cards, there was a circular which had apparently been written before the hormones of estrone and progesterone had been extracted from the corpus luteum and segregated in crystalline form.

In none of these documents, however, any more than in the labels which have been annexed to this opinion, was there any "professed" standard or quality under which the product was sold either in respect of its strength or purity.

The claimant merely offered for sale a desiccated preparation in tablet form of the corpus luteum of the sow without comparing it with any standard of strength or purity, or asserting any.

Consequently, the basis for a claim of adulteration has wholly failed for there is not any statement in any of the relevant documents of the strength or purity of Lutein Tablets. E. g. United States v. 17 Bottles of B & M, D.C., 55 F.2d 264, 266.

IV. The second branch of the case is based on Title 21 United States Code, Section 9, 21 U.S.C.A., § 9, which, so far as here relevant, reads:

"Sec. 9. Misbranded; meaning and application. The term 'misbranded,' as used in sections 1 to 15, inclusive, of this title, shall apply to all drugs, or articles of food, or articles which enter into the composition of food, the package or label of which shall bear any statement, design, or device regarding such article, or the ingredients or substances contained therein which shall be false or misleading in any particular \* \* \*." (June 30, 1906, c. 3915, Sec. 8, 34 Stat. 771; Aug. 23, 1912, c. 352, 37 Stat. 416; Mar. 3, 1913, c. 117, 37 Stat. 732.)

On the question of adulteration, with which I have just dealt, it is possible to look at documents other than the mere labels on the bottles of tablets.

On the question of misbranding, however, I am limited to those labels, and—as above indicated—those labels are of two kinds which are substantially equivalent in meaning.

I have held that there was not any misbranding because after carefully considering the method of manufacture of the tablets—which I approached in a very skeptical frame of mind—I have come to the conclusion that, allowing for the tolerance of error expectable in all manufacturing processes, the claimant lives up to its labels and gives to its medical public in its tablets just what it purports in those labels to give them.

V. In view of Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c—which are now effective, as I understand it, in a non-jury cause of legal cognizance like this, despite its embroidery of admiralty terminology—it is a work of supererogation to write a considered opinion on the facts or law, for its place will be taken by formal findings of fact and conclusions of law separately stated, and in this proceeding, therefore, I will only refer to such facts as I think may tend to explain my decision. The few facts which I state must, therefore, be supplemented by other facts to be proposed by counsel for the claimant when they submit their findings of fact for my approval, because the juridical results of this cause, which respective counsel have so very carefully tried, should be adequately recorded.

VI. It is common ground that there was not any fraud of any kind in connection with the manufacture or sale of the claimant's Lutein Tablets or their labels, or accompanying instructions.

It is common ground that Lutein Tablets have not any harmful effect when taken orally.

Certain facts have been stipulated. They are quite important facts and should be incorporated in the findings of fact to. be submitted as hereinafter prescribed.

VII. In every case there are certain facts, either stipulated or otherwise admitted or proved practically without challenge, which constitute the control by which all the other facts and the conclusions of law have to be tested.

Herein, in addition to those stipulated and to certain known facts of physiology which may be dealt with in the findings, these are some of the master facts:

1. The ovaries of sows contain corpora lutea which develop as in all female mammals after ovulation.

2. Corpora lutea contain all the sex hormones herein involved—whatever they may be—and whether yet discovered or not.

3. There is, roughly speaking, by weight 500 times more of the hormone progesterone in fresh corpora than there is of the hormone estrone. These are the only two definitely recognized hormones of the corpus luteum, although it is claimed by many gynecological students that there are other hormones therein. By reason of its predominance therein progesterone has often been referred to as the corpus luteum or lutein hormone.

4. Therefore, you have in a corpus luteum the synergism of estrone and progesterone and of any other hormones which may be lurking in it for whatever that may be worth.

5. There is not in the claimant's lutein tablets any statement as to the amount of the progesterone hormone which is contained in each tablet.

6. What is stated in the labels about each tablet is merely that it represents approximately twenty grains of fully developed corpora lutea from which inert matter has been removed.

Each label contains instructions as to dosage, but there is not any representation as to what therapeutic value they may have, and, therefore, they are entirely outside of Section 10 of the Act.

8. The same powder is used to make lutein extract as is made into lutein tablets.

9. Oral administration in most medications requires a much larger dosage to achieve a result than does parenteral administration.

VIII. Now, we have a series of variables that are almost inevitable in a cause like this, which really involves one of the more recent developments of medicine. I think I can state enough of them to indicate their general nature and the general juridical effect which they have, although I will not try to name them all.

These variables all involve certain assumptions, and are:

1. That all ovaries of sows are identic as to progesterone content.

2. That all experimenters in extraction of progesterone are equally skilled, and

3. That there is a standard method for making an extraction of progesterone, a fact of which I am not satisfied.

4. That operations preparatory to the Corner-Allen tests on test animals do not so upset the metabolism or physiological reactions of the animals as to make a serious difference in the tests made on them.

This, of course, as we all know who have been here during the trial, is a question that does not arise in what is

called the Clauberg test where there is no operation on the test animal.

5. That the test animals are all substantially identic in their reaction, metabolism and so forth.

6. That observers of the results achieved on test animals by tests are equally selectively perceptive.

These are just a few of the variables that are involved in this cause, it seems to me. I feel, therefore, that I am really asked to traverse the domain of surmise—from which courts are by their nature excluded—as to many aspects of this cause in order to find any possible decree in favor of the libelant.

IX. In order to establish its cause of action in respect of either branch of the libels, it is necessary for the United States to show—as in any other civil case—by a fair preponderance of evidence that the sections of the statute invoked have been contravened by the accused products.

Now, as to the value of the evidence—

In a non-jury cause of this kind I, as trier of the facts, have to be persuaded by the evidence. As I am sitting without a jury I have this to say about the evidence:

I am satisfied that on the evidence of the experiments, the government has not succeeded in proving its case of misbranding by a preponderance of the evidence— by which I mean in effect that the evidence on the experiments has, more or less, stopped at dead center.

The clinical evidence with regard to the use of lutein tablets, I think, is clearly in favor of the claimant.

X. Having seen all the witnesses on both sides, I have come to the considered opinion that this cause has resolved itself into a conflict of opinion among doctors on a question of therapeutics which does not in its essence involve any really seriously disputed questions of fact.

The real claim here is not a claim of adulteration, or a claim of misbranding, but, as it seems to me, in effect, is a claim of the alleged obsolescence of the claimant's lutein tablets.

It seems to me that looking at such a body of proof, as I have been through during the past month, dispassionately, it does not constitute enough to sustain the government's case involving a subject which is on a hitherto unsettled frontier of the art of medicine.

Whether we should brand as obsolescent in his therapeutical technique a doctor who is not persuaded that a new hormonal therapy should supersede an ovarian therapy which he has found from years of experience to be, in his opinion, valuable, is perhaps not the real question here. But in the light of some such theory, the government asks for a decree herein, and, in effect, claims that all doctors should be equally up to date. But that situation never has existed and never will. There is no such marshaling possible among practitioners of medicine, and it was not intended that the Pure Food and Drugs Act of 1906 should furnish machinery for such a purpose. Honest differences of opinion, as herein shown, are not within the purview thereof. Cf. Seven Cases of Eckman's Alterative v. United States, 239 U.S. 510, 517, 36 S. Ct. 190, 60 L.Ed. 411, L.R.A.1916D, 164.

And as the tablets here in question are, by the evidence of the government's own experts, not harmful when taken orally, and as I have found that they were not misbranded or adulterated, and that no question of fraud under Section 10 of the Pure Food and Drugs Act is involved, the libels must be dismissed, and—because the government is involved as libelant—without costs being granted to the claimant.

XI. In pursuance of Rule 52(a) of the Rules of Civil Procedure, the attorneys for the claimant must prepare, in accordance with this opinion, and submit to me through the Clerk's Office, findings of the ultimate facts herein, including those above indicated, and the conclusions of law as herein found.

I do not want details of evidence submitted as findings of ultimate facts, but, as above indicated, there should be findings of fact—many of them—in addition to those herein mentioned which confessedly have been very sketchy, in order that a full record of the juridical result of these very carefully tried causes may be made and preserved.

These findings should, in my opinion, in order to have their full value as a record, include inter alia the whole history of the origin of lutein tablets so far as shown by this record, and of the lutein solution so far as shown by this record.

Then there also should be a statement of the normal menstrual cycle as physiologically observed and agreed on by the medical profession, and the operation, as presently understood, of hormones in relation thereto, so far as shown by the record, should also be made a part of the findings of fact, so that there will be a background before the discussion of any tests are mentioned in the findings.

All proposed findings of fact and conclusions of law submitted to me must be typed in *triple spacing* so I may conveniently correct them if I wish to do so. The attorneys for the claimant must give *ten days'* notice of their proposed findings of fact and conclusions of law to the United States Attorney.

In submitting their findings of fact the attorneys for the claimant must also submit *at the same time* a short memorandum in a separate cover *bound at the left-hand side,* and serve the same on the United States Attorney. This memorandum must indicate accurately the pages of the evidence on which each finding of fact proposed is to be based. To draw such a document is a very simple matter, although sometimes it takes a little time, and having it submitted makes it possible for me as the trial judge to look up any question of fact about which I may be in doubt or which I may have entirely forgotten.

The United States Attorney, if he is so advised, may, on the return day of such notice, submit to me and serve on claimant's attorneys criticisms of the findings of fact proposed by them.

As under Rule 52(a) only findings of fact and conclusions of law which I sign will be filed as part of the record herein, I suggest the above course for the United States Attorney because counter-findings of fact will not avail him aught. The United States Attorney must take his objections, if any, to my findings of fact and conclusions of law by way of appropriate assignments of error on any appeal which he may take.

I should like to add here something which I have not yet said in connection with these findings of fact, namely, that when a criticism is made by the United States Attorney of the proposed findings of the other side, he must make a constructive criticism which will correct the proposed finding, and not merely make a criticism which will, in effect, amount to an assignment of error to the finding proposed.

XII. Under the Federal Rules of Civil Procedure—and I think also under the present Admiralty Rule 46½, 28 U.S.C.A. following section 723, if we should now be considered as dealing thereunder—the signing of findings of fact and conclusions of law is the juridical act formalizing the court's decision, but, curiously, attorneys are usually laggard in submitting these findings.

A sanction which will make the attorneys for the claimant perhaps file their proposed findings of fact and conclusions of law with reasonable promptness is, therefore, necessary. In the instant cause, accordingly, I hold that unless the findings of fact and conclusions of law herein are submitted to me on or before May 27, 1940, they will not be considered until after my return to town in October, 1940.

XIII. In closing the trial of this cause I want again to express the greatest appreciation for the temper and spirit in which it has been tried. To counsel for both sides I wish to state that I doubt if you have any idea how much it means to a judge to have counsel, such as you are, before him. I shall always remember this trial with the greatest pleasure, and I want you to remember that it is implicitly the best compliment which a judge can pay to counsel, who try a cause before him, to feel that he may decide it from the Bench.

XIV. Now, I have a footnote to add to this memorandum opinion.

It seems to me that when, as will again, expectably, often happen in the future, scientific questions of such kind as have been here involved, come up to be considered, and the government is contemplating a proceeding to seize, or has seized, a sample of a drug in its container, it would save an enormous amount of time on the trial and would add little heat and great light to the result, if the government and the drug manufacturer should have a joint survey and joint tests.

This is always done, I think, in the case of ships, and if the survey be not joint it is viewed with the greatest suspicion by the Court.

For instance, in this cause, the notice of survey would have gone something like this:

"We are going to have at a certain place, on a certain named forward date, a survey consisting of tests and bio-assays made of lutein tablets of your manufacture, and in addition also a chemical assay. We are going to call as our surveyor who will do our part of the tests, Dr. Willard Allen, whom we know and in whom we have confidence, etc.

"You are asked to be present, personally or by representative, if so advised, and to participate in such tests at the place and on the date above named."

The date should be chosen far enough forward to make it reasonably possible for the claimant to send to the survey its chosen representative.

If the parties had had a joint survey in pursuance of a notice like that in this cause, even if I were not saved the trial of the cause, I should, at any rate, have been saved a great deal of effort in differentiating one kind of test procedure from another. In a complicated cause like this, it is very difficult for a judge successfully to assess slight scientific differences that may, for aught he knows, mean much in a test.

With this cautionary suggestion as to future procedure, which it seems to me has had fortunate analogies for years in admiralty practice, I will now end this very pleasant forensic association.