UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2009

(Argued:  February 19, 2010                 Decided:  July 6, 2010)

Docket No. 09-0437-cv

_____

In re NOVARTIS WAGE AND HOUR LITIGATION

_____

Before:  KEARSE and HALL, Circuit Judges, RAKOFF, District Judge[*].

    Appeal from a judgment of the United States District Court for the Southern District of New York, Paul A. Crotty, Judge, dismissing claims of pharmaceutical company sales representatives for overtime pay under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 et seq., and state law, finding that such representatives fell within exemptions for outside salesmen and for administrative employees exercising discretion and independent judgment. See 593 F.Supp.2d 637 (2009).

    Vacated and remanded.

_____

[*]  Honorable Jed S. Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

JEREMY HEISLER, New York, New York (David W. Sanford, Katherine M. Kimpel, Sanford, Wittels & Heisler, Washington, D.C., Steven Wittels, Andrew Melzer, Sanford, Wittels & Heisler, New York, New York, on the brief), for Plaintiffs-Appellants.

RICHARD H. SCHNADIG, Chicago, Illinois (Vedder Price, Chicago, Illinois, Jonathan A. Wexler, Vedder Price, New York, New York, on the brief), for Defendant-Appellee.

JENNIFER R. MARION, United States Department of Labor, Washington, D.C. (Carol A. De Deo, Deputy Solicitor for National Operations, William C. Lesser, Deputy Associate Solicitor, Paul L. Frieden, Counsel for Appellate Litigation, United States Department of Labor, Washington, D.C., on the brief), for Amicus Curiae Secretary of Labor in support of Plaintiffs-Appellants.

OUTTEN & GOLDEN, New York, New York (Justin M. Swartz, Rachel Bien, Outten & Golden, New York, New York, Catherine K. Ruckelshaus, National Employment Law Project, New York, New York, George A. Hanson, Bradley T. Wilders, Stueve Siegel Hanson, Kansas City, Missouri, Rebecca M. Hamburg, National Employment Lawyers Association, San Francisco, California, Richard J. (Rex) Burch, Bruckner Burch, Houston, Texas, of counsel), filed a brief on behalf of Amicus Curiae National Employment Lawyers Association in support of Plaintiffs-Appellants.

PAUL, HASTINGS, JANOFSKY & WALKER, Washington, D.C. (Neal D. Mollen, Paul, Hastings, Janofsky & Walker, Washington, D.C., Robin S. Conrad, Shane B. Kawka, National Chamber Litigation Center, Washington, D.C., of counsel), filed a brief on behalf of Amicus Curiae Chamber of Commerce of the United States of America in support of Defendant-Appellee.

KEARSE, Circuit Judge:

In these consolidated class actions, the plaintiffs, current or former pharmaceutical sales representatives employed by defendant Novartis Pharmaceuticals Corporation ("Novartis"), appeal from a judgment of the United States District Court for the Southern District of New York, Paul A. Crotty, Judge, denying their claims under the Fair Labor Standards Act of 1938 ("FLSA" or the "Act"), 29 U.S.C. § 201 et seq., and state law, for overtime pay with respect to time worked in excess of 40 hours per week. The district court granted Novartis's motion for summary judgment on the ground that plaintiffs are outside salesmen and/or administrative employees who are exempted from the FLSA's overtime pay requirements. On appeal, plaintiffs contend that the district court did not properly apply the exemption standards set out in regulations promulgated under the FLSA by the United States Secretary of Labor (the "Secretary"), see 29 C.F.R. §§ 541.200-541.204, 541.500-541.504. The Secretary, appearing as amicus curiae, endorses that contention. For the reasons that follow, we agree with plaintiffs and the Secretary; we thus vacate the judgment of the district court.

I. BACKGROUND

Novartis researches, manufactures, markets, and sells pharmaceuticals. The plaintiffs are some 2,500 persons who were employed by Novartis at various times between March 23, 2000, and

- 3 -

April 7, 2007, as sales representatives ("Reps") in California or New York, and who are parties to class actions in the United States District Courts for the Central District of California or the Southern District of New York, respectively, along with Reps employed by Novartis in other states during that period who have opted to join these actions. The actions were consolidated in the Southern District of New York by the Judicial Panel on Multidistrict Litigation for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407. Plaintiffs alleged principally that under the FLSA and state law, they were entitled to overtime pay at the rate of one and one-half times their normal compensation for time worked in excess of 40 hours per week. The following facts are not in dispute.

A. Novartis's Use of Pharmaceutical Sales Representatives

To market its pharmaceuticals, Novartis has a team of "brand" managers who, cognizant of limitations imposed by the United States Food and Drug Administration ("FDA"), devise descriptions of the essential features of each Novartis drug. Marketing managers assist in the production of written promotional materials. Novartis has regional managers who are involved in hiring, firing, and business planning decisions, including working on marketing strategy with the marketing team. Reporting to the regional managers are district managers who supervise the Reps.

Under federal regulations, Novartis is prohibited from selling its prescription drugs directly to patients. Instead,

- 4 -

Novartis typically sells its products to wholesalers, which sell them to individual pharmacies. Physicians write prescriptions that permit patients to purchase those products from pharmacies. Novartis employs some 6,000 Reps nationwide and assigns them to make what Novartis characterizes as "sales" calls on physicians.

Reps do not sell the Novartis products to physicians. Although Novartis advertises openings for Reps as sales positions, the Reps' duties do not include "the exchange of good[s] or services, contracting to sell any good or service, consigning for the sale of any good or service, or obtaining orders or contracts for the use of facilities." (Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment ¶ 107; Defendant Novartis Pharmaceuticals Corporation's Responses to Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment ¶ 107.) Rather, in visits typically lasting no longer than five minutes, the Reps provide physicians with information about the benefits of particular Novartis pharmaceuticals and encourage the physicians to prescribe those products. Reps give physicians reprints of clinical studies reporting findings about the Novartis products. Reps also inform doctors as to whether Novartis products are among those for which insurers will pay, resulting in little or no cost to patients. The Reps give the physicians samples of drugs; these samples are not sold, and no money is exchanged. Indeed, selling drug samples is a federal crime. See 21 U.S.C. §§ 353(c)(1), 333(b)(1)(B). The goal of the Reps is to

get physicians to say they will prescribe Novartis products for their patients.

To enable the Reps to reach that goal, Novartis puts them through a training program for several weeks. The training is extensive, ranging from instruction on the medical benefits of each Novartis drug--and the way in which Reps should present favorable scientific studies--to matters of technique as detailed as how they should hold their pens when showing Novartis's written material to physicians.

In the training program, a Rep is taught how to question physicians to determine why they may be hesitant about prescribing Novartis products and then to offer arguments to overcome their reluctance. Novartis instructs the Reps on four "social styles" that a given individual may have in interacting with others and teaches the Reps how to tailor their presentations to a physician's particular social style. Novartis has also hired consultants to observe its most successful Reps and incorporate their techniques into the training program.

Novartis sets the number of times per trimester a Rep must call on each physician and how often specific drugs should be promoted. For each product in each trimester, Novartis has a principal marketing message--its "core message"--developed by the Novartis brand managers, which Reps are instructed to convey to physicians on each call. Novartis gives the Reps written promotional materials developed by its brand and marketing managers, including posters, brochures, and laminated cards, to

use on sales calls. The Reps do not play any part in formulating the core message or the written materials; nor do they play any part in devising Novartis's advertising. During training, Reps are required to engage in role-playing, using scripts to practice delivering the core message and parrying objections from physicians.

Although the Novartis training material encourages the Reps to tailor their pitches to an individual physician, they are not allowed to deviate from the core message. They are not allowed to use any written materials other than those provided by Novartis. One Rep testified that Reps were expected to act like "robots" because of the limitations on what they could say during sales calls. If a physician asks a Rep a medical question for which Novartis has not prepared an answer, the Rep is required to refer the doctor to Novartis's medical department.

The Reps report to their district managers by telephone at least every week or two, and sometimes report or confer daily. In addition, once or twice a month, the district managers accompany the Reps on their visits to physicians. During these ride-alongs, the managers observe the Reps' meetings and critique their performance. Reps receive negative reviews if they deliver the Novartis core message in a way that violates FDA-imposed limitations or Novartis policies.

As the Reps do not make sales, they are trained to end their meetings with physicians with a "closing" in which they may ask, "Doctor, will you prescribe this product for your patients

who suffer from [the appropriate medical conditions]?" They may also ask, "Doctor, do I have your commitment to prescribe it[?]" One Novartis district manager described this type of colloquy as a "persuasive sale" but acknowledged that there was no way to know whether any physician actually followed through on such a commitment. One Rep stated that a physician might answer affirmatively just to get the Rep out the door.

As to physicians who refuse to entertain office visits from Reps, Novartis instructs the Reps to use other techniques to make contact, such as showing up at hospitals early in the morning before medical rounds. Reps also organize meals and other programs for physicians where speakers promote Novartis products. For such programs, Novartis maintains a list of cooperating doctors, from which Reps must book speakers. Reps manage the budgets for these events, but do so within limits set by Novartis managers; Novartis sets a minimum number of such events that it expects each Rep to hold.

Novartis does not know how many prescriptions individual physicians write for its products. It subscribes to several services that provide it with information as to when prescriptions for Novartis products are filled at pharmacies that report such information to the services; this information identifies the prescribing physicians. Because the data are gathered from pharmacies, however, these reports represent only the number of prescriptions the reporting pharmacies filled, not all the prescriptions actually written. Further, because some 19,000

pharmacies do not report sales to these services, Novartis has data for only about 72% of all filled prescriptions. Novartis extrapolates from the reported sales in order to estimate the sales at non-reporting pharmacies, and it believes those estimates generate a fairly accurate picture of how many prescriptions are being filled at non-reporting pharmacies; however, the latter prescriptions cannot be traced to particular physicians.

Notwithstanding the absence of actual information as to the numbers of prescriptions for Novartis drugs written by particular physicians, the Reps, whose base wages are at least $455 a week, receive up to a quarter of their compensation as bonuses based on their performance with physicians. Given the limits of its ability to monitor physicians' actual prescriptions, Novartis sets goals for the number of prescriptions it hopes to have filled in a particular territory, and it pays a Rep a bonus when the number of filled prescriptions attributable to physicians in the Rep's territory exceeds the goal Novartis has set. Some Novartis Reps earn more than $100,000 a year. In 2005, Novartis Reps' total compensation averaged $91,539.

The FLSA provides that many employees must be paid one and one-half times their regular rate of compensation for time worked in excess of 40 hours a week, see 29 U.S.C. § 207(a)(1), but provides that certain categories of workers are excluded from this requirement, see id. § 213. Novartis Reps are expected to be in the field from 8 a.m. to 5 p.m. on work days; they eat lunch with physicians or while driving to or from their physician visits; and

they attend the mandatory dinner programs, which sometimes prevent them from returning home before 9 or 10 p.m. Notwithstanding a standard week of five such nine-hour days plus the occasional evening work, Novartis does not give its Reps overtime pay. As is the practice throughout the pharmaceuticals industry, Novartis treats its Reps as exempt from the overtime pay requirement in the FLSA, as well as from comparable state-law requirements.

B. The Decision of the District Court

In the consolidated proceedings, Novartis moved for summary judgment dismissing the complaints on the ground that plaintiffs were "outside salesm[e]n" and/or "administrative" employees, 29 U.S.C. § 213(a)(1), and thus exempt from the overtime pay provisions of FLSA and state labor laws. Novartis also argued that those Reps who earned more than $100,000 a year were exempt under 29 C.F.R. § 541.601 (entitled "Highly compensated employees"). Plaintiffs cross-moved for partial summary judgment ruling that they are not in an exempt category.

Ruling that it need not determine whether any Reps were exempt as highly compensated employees, the district court denied plaintiffs' motion and granted Novartis's motion on the ground that the "Reps are not entitled to overtime compensation because they are exempt from coverage as outside salespersons under the FLSA and state laws, and even if they are not outside salespersons, they are administrative employees and are still

- 10 -

exempt." In re Novartis Wage & Hour Litigation, 593 F.Supp.2d 637, 640 (S.D.N.Y. 2009) ("Novartis I").

With respect to the contention that the Reps were exempt as outside sales employees, see 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.500, the district court reasoned that the Reps met the spirit and the letter of that exemption. It stated that excluding Reps from the exemption merely because they may not "'sell'" in a "technical[]" sense, Novartis I, 593 F.Supp.2d at 649 (citing Jewel Tea Co. v. Williams, 118 F.2d 202 (10th Cir. 1941)), would "ignore[] the Act's spirit, purpose, and goals." Novartis I, 593 F.Supp.2d at 648. The court stated that

> Jewel Tea teaches that outside salespersons are exempt from the overtime requirement not because they "sell," as that term is technically defined, but rather because they (1) generate commissions for themselves through their work and (2) work with minimal supervision, making adherence to an hours-based compensation scheme impractical.

Novartis I, 593 F.Supp.2d at 648-49 (emphasis added). The court also found that Reps do make sales for Novartis ("NPC"), stating as follows:

> Legally, Reps cannot sell NPC drugs directly to physicians. . . . Further, physicians have an ethical obligation to prescribe only drugs suitable for their patients' medical needs, meaning that they cannot make a binding commitment to a Rep to prescribe certain NPC products. . . . Nevertheless, . . . the physicians called upon by Reps ultimately control the purchase of NPC products by writing prescriptions. . . . [A]bsent a prescription from a doctor, the patient end-users of NPC drugs are not able to obtain those drugs. NPC spends in excess of $500 million annually to have its Reps meet on a frequent and repeat basis with these physicians to seek their commitments to prescribe NPC products. In other words, Reps make sales in the sense that sales are made in the pharmaceutical industry.

- 11 -

_Id._ at 650 (emphases added).

Rejecting plaintiffs' contention that the Reps do not make sales because sales of pharmaceuticals are made only by manufacturers to wholesale distributors, then by distributors to pharmacies, and finally by pharmacies to patients, the district court stated that

> [t]he Court cannot ignore reality. Distributors are not the end-users of NPC's products. If physicians did not prescribe NPC products, patients would be unable to buy them and distributors would have no incentive to make purchases from NPC. The purchase cycle commences with a prescription from physicians, who are therefore the appropriate target of the Reps' sales efforts. When the physician writes a prescription for the NPC product, then a sale can take place.

_Id._

With respect to the exemption for administrative employees, _see_ 29 U.S.C. § 213(a)(1); 29 C.F.R. §§ 541.200, 541.202, the district court concluded that the Reps also fell within that category, stating that they earn in excess of $455 a week, "they engage in work that is directly related to the management or general business operations of NPC and they exercise discretion and independent judgment with respect to matters of significance." _Novartis I_, 593 F.Supp.2d at 655. The district court concluded that Reps are engaged in work related to the management or general business operations of Novartis because Reps are not engaged in the production of Novartis pharmaceuticals and because the Reps are critical to dissemination of information about Novartis products:

Reps meet with physicians and provide them with information about NPC drugs in an attempt to persuade the physicians to write prescriptions for those drugs. The Reps' success in obtaining prescriptions is critical to NPC's business. The sizeable incentive payments made to Reps for generating prescriptions, as well as the more than $500 million paid to the 6,000 Reps, buttress[] the conclusion that obtaining prescriptions for its drugs is critical to NPC's success. There is no other rational explanation for the commitment of this level of financial resources to NPC's sales effort.

Id. at 656. The court concluded that Reps exercise "discretion and independent judgment with respect to matters of significance" because

Reps are expected to use initiative to increase the number of prescriptions written for their drugs-- oftentimes, this involves building a good rapport with the physicians and their staffs. Within the confines of the "core messages" created by NPC, Reps must decide how best to present their information and must determine what type of "close" is most appropriate in a given situation. This, of course, depends on how much time the physician will allow the Rep, the physician's patient base and prescribing history, and numerous other factors. Reps set their daily call schedules and are expected to use their entertainment budgets to host informational events for the physicians on their target lists. In carrying out these activities, they are quite clearly attempting to increase prescriptions for their drugs--a matter of considerable significance for NPC.

Id. at 657. The district court was unpersuaded that Novartis's training and expectations rendered Reps "robots" or automatons who did not exercise significant discretion:

These labels are not facts, but merely arguments designed to avoid the overtime exemptions. They do not begin to answer why or how a robot or an automaton could or should earn an average salary of $91,500 per year. Nor do they explain why NPC would employ 6,000 Reps at a cost in excess of half a billion dollars per year. They are an attempt to avoid the consequences of what Reps do every day--

- 13 -

arranging to call on physicians and, after assessing how much time is available for the call, choosing the best possible approach to convince the physician to prescribe NPC drugs the next time an appropriate patient opportunity presents itself. NPC pays a good salary and material incentives to encourage this behavior. Reps are given drug samples, printed materials, and core messages. They are dispatched to the offices of physicians in an attempt to convince those physicians to prescribe NPC products. It defies logic to accept that, in such a situation, Reps are expected to do nothing but chant slogans and mouth platitudes. At the bare minimum, Reps must be capable of tailoring their presentation to a given timeframe--deciding how best to convey the "core message" in a manner that will have the desired effect on the physician. Such a decision involves making an independent judgment, free of direct oversight, even if NPC has provided Reps with guidelines for conveying certain information in a certain manner. Thus, while the exact nature of the discretion and independent judgment exercised by Reps may be in dispute, . . . on the present facts, NPC's Reps have discretion and exercise independent judgment.

Id.

Accordingly, having found both the outside salesman and administrative employee exemptions applicable, the district court granted Novartis's motion for summary judgment dismissing plaintiffs' claims under the FLSA. In addition, finding that the New York overtime pay exemptions were defined and applied in the same manner as those in the FLSA, see Novartis I, 593 F.Supp.2d at 646, and that California law, although differing slightly in the ways it defined the exemption, was "essentially the same as the FLSA and New York law," id. at 647, the court granted summary judgment dismissing plaintiffs' state-law claims.

This appeal followed.

- 14 -

## II.  DISCUSSION

On appeal, the Reps contend principally that the district court erred in concluding that they are outside sales employees, given that the "[t]he undisputed evidence in this case shows that the Reps do not obtain orders, form contracts, or engage in any type of sale as that term is defined by the FLSA" (Plaintiffs' brief on appeal at 46), and in concluding that Reps are administrative employees given that "[t]hey lack discretion and independent judgment within [the] meaning of the administrative exemption" (id. at 63).  Novartis defends the district court's conclusions, arguing that Reps make sales "in the only practical sense applicable to the pharmaceuticals industry" (Novartis brief on appeal at 27), and that, in so doing, the Reps exercise discretion and independent judgment (see id. at 48-55).

The Secretary of Labor, participating in this appeal as an amicus curiae in support of the Reps, points out that Department of Labor ("DOL" or "Department") regulations promulgated under the FLSA (a) provide, in pertinent part, that an "outside salesman" is one who, inter alia, has the primary duty of "making sales," and (b) provide that an exempt "administrative" employee is one who, inter alia, exercises discretion and independent judgment with respect to matters of significance.  The Secretary contends that because the Reps do not make sales or obtain orders and do not exercise discretion and independent judgment, they are not within the "outside salesman" or the "administrative" employee

categories that are exempted from the FLSA overtime pay requirements. Novartis argues that the Secretary's interpretations are contrary to the regulations themselves. The United States Chamber of Commerce has filed a brief as _amicus curiae_ in support of Novartis, citing _Gonzales v. Oregon_, 546 U.S. 243, 257 (2006), and arguing that the Secretary's interpretations are not entitled to deference, on the theory that the regulations merely parrot the FLSA's language and that the Secretary is thus interpreting only the words of Congress, not those of the regulations.

For the reasons that follow, we conclude that the Secretary's regulations define and delimit the terms used in the statute; that under those regulations as interpreted by the Secretary, the Reps are not outside salesmen or administrative employees; and that the Secretary's interpretations are entitled to "controlling" deference, _Auer v. Robbins_, 519 U.S. 452, 461 (1997).

A.  The FLSA's Overtime Pay Requirement

Congress enacted the FLSA in 1938 to combat "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." FLSA § 2(a), 29 U.S.C. § 202(a). Section 7(a)(1) of the FLSA provides, in pertinent part, that

> no employer shall employ any of his employees who in
> any workweek . . . is employed in an enterprise
> engaged in commerce or in the production of goods for
> commerce, for a workweek longer than forty hours

*unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed*.

29 U.S.C. § 207(a)(1) (emphases added). To the extent pertinent to this appeal, FLSA § 13(a)(1) exempts from that overtime pay requirement

> any employee employed in a *bona fide* . . . *administrative* . . . capacity . . . or in the capacity of *outside salesman* (as such terms are defined and delimited from time to time by regulations of the Secretary[)].

29 U.S.C. § 213(a)(1) (emphases added). The FLSA definitions section provides that

> "[s]ale" or "sell" includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition.

FLSA § 3(k), 29 U.S.C. § 203(k).

"The overtime requirements of the FLSA were meant to apply financial pressure to 'spread employment to avoid the extra wage' and to assure workers 'additional pay to compensate them for the burden of a workweek beyond the hours fixed in the act.'" Davis v. J.P. Morgan Chase & Co., 587 F.3d 529, 535 (2d Cir. 2009) (quoting Overnight Motor Transportation Co. v. Missel, 316 U.S. 572, 578 (1942), superseded by statute, Portal-to-Portal Pay Act of 1947, ch. 52, 61 Stat. 84). Because the FLSA is a "remedial law," Reiseck v. Universal Communications of Miami, Inc., 591 F.3d 101, 104 (2d Cir. 2010), exemptions to the overtime pay requirement are "'narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and

spirit.'" Bilyou v. Dutchess Beer Distributors, Inc., 300 F.3d 217, 222 (2d Cir. 2002) (quoting Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960)). The burden of proving that employees fall within such an exemption is on the employer. See, e.g., Bilyou v. Dutchess Beer Distributors, Inc., 300 F.3d at 222.

We review de novo a district court's grant or denial of summary judgment, viewing the record in the light most favorable to the party against whom summary judgment is sought. See, e.g., Dillon v. Morano, 497 F.3d 247, 251 (2d Cir. 2007). Whether the duties of a job qualify an employee for a FLSA exemption is a question of law, which we review de novo. See, e.g., Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986); Zheng v. Liberty Apparel Co., 355 F.3d 61, 76 (2d Cir. 2003).

B.  The "Outside Salesman" Exemption

Pursuant to her statutory mandate to "define[] and delimit[]" the terms "outside salesman" and "administrative" employee, 29 U.S.C. § 213(a)(1), the Secretary has promulgated several regulations. Regulations issued in 2004 provide, inter alia, that "[a] job title alone is insufficient to establish the exempt status of an employee," 29 C.F.R. § 541.2; rather, that status may be determined only on the basis of the employee's "salary and duties," id. With respect to "outside salesman," the regulations provide as follows:

> (a) The term "employee employed in the capacity of outside salesman" in section 13(a)(1) of the Act shall mean any employee:

- 18 -

> (1) _Whose primary duty is_:
>
>> (i) _making sales_ within the meaning of section 3(k) of the Act, _or_
>>
>> (ii) _obtaining orders_ or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
>
> (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.
>
> (b) . . . . In determining the primary duty of an outside sales employee, work performed incidental to and in conjunction with _the employee's own outside sales_ or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work. Other work that furthers the employee's sales efforts also shall be regarded as exempt work including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences.

_Id._ § 541.500 (emphases added). Elaborating on the meaning of sales of commodities, as contrasted with sales of services or the use of facilities, the regulations provide that

> [s]ales within the meaning of section 3(k) of the Act _include the transfer of title_ to tangible property, and in certain cases, of tangible and valuable evidences of intangible property. Section 3(k) of the Act states that "sale" or "sell" includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition.

29 C.F.R. § 541.501(b) (emphasis added).

The regulations go on to describe the circumstances in which an employee's efforts to "promot[e]" a product constitute-- or do not constitute--"sales" within the meaning of the regulations:

(a) <u>Promotion work</u> is one type of activity often performed by persons who make sales, which <u>may or may not be exempt outside sales work</u>, depending upon the circumstances under which it is performed. Promotional work that is actually performed incidental to and <u>in conjunction with an employee's own outside sales or solicitations is exempt work</u>. On the other hand, <u>promotional work that is incidental to sales made, or to be made, by someone else is not</u> exempt outside sales work. . . .

(b) A manufacturer's representative, for example, may perform various types of promotional activities such as putting up displays and posters, removing damaged or spoiled stock from the merchant's shelves or rearranging the merchandise. <u>Such an employee can be considered an exempt outside sales employee if the employee's primary duty is making sales or contracts</u>. <u>Promotion activities directed toward consummation of the employee's own sales are exempt</u>. <u>Promotional activities designed to stimulate sales that will be made by someone else are not</u> exempt outside sales work.

Id. §§ 541.503(a)-(b) (emphases added).

As described in the preamble to the 2004 DOL regulations, these rules had their origins in regulations adopted after DOL hearings conducted in the 1940s (resulting in a 1940 "Stein Report" and a 1949 "Weiss Report"), see <u>Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees</u>, 69 Fed. Reg. 22122, 22124 (Apr. 23, 2004) ("2004 Final Rule" or "Final Rule"). The Final Rule's preamble ("Preamble") discussed whether an outside employee's promotional activities qualify him as a "salesman" and emphasized that no one could be considered a salesman within these regulations unless he in some sense made a sale.

Addressing concerns expressed by such groups as the Grocery Manufacturers Association, the National Association of

Manufacturers, and the U.S. Chamber of Commerce for the emphasis on an employee's "own" sales, given the technological advances that enable a customer to place its own order directly with a supplier, the DOL agreed that a determination of whether an employee is exempt as an outside salesman "should not depend on whether it is the sales employee or the customer who types the order into a computer system and hits the return button." 2004 Final Rule at 22163. But while the Preamble stated that the DOL "agree[d] that technological changes in how orders are taken and processed should not preclude the [outside salesman] exemption for employees who in some sense make the sales," id. at 22162, it emphasized that

> the Department does not intend to change any of the essential elements required for the outside sales exemption, including the requirement that the outside sales employee's primary duty must be to make sales or to obtain orders or contracts for services. An employer cannot meet this requirement unless it demonstrates objectively that the employee, in some sense, has made sales. See 1940 Stein Report at 46 (outside sales exemption does not apply to an employee "who does not in some sense make a sale") (emphasis added). Extending the outside sales exemption to include all promotion work, whether or not connected to an employee's own sales, would contradict this primary duty test.

2004 Final Rule at 22162 (first two emphases ours). The Preamble also elaborated on the primary-duty standard:

> Employees have a primary duty of making sales if they "obtain a commitment to buy" from the customer and are credited with the sale. See 1949 Weiss Report at 83 ("In borderline cases the test is whether the person is actually engaged in activities directed toward the consummation of his own sales, at least to the extent of obtaining a commitment to buy from the person to whom he is selling. If his efforts are directed toward stimulating the sales of

- 21 -

*his company generally rather than the consummation of his own specific sales his activities are not exempt*").

2004 Final Rule at 22162-22163 (emphases ours).

We note that the distinction between obtaining commitments to buy and promoting sales by other persons has been respected in areas other than the pharmaceutical industry. See, e.g., Gregory v. First Title of America, Inc., 555 F.3d 1300, 1309 (11th Cir. 2009) (employee who obtained commitments to buy her employer's title insurance service and was credited with those sales, and all of whose efforts were directed towards the consummation of her own sales and not towards stimulating sales for the employer in general, was an outside sales employee within the meaning of the FLSA and the regulations); Clements v. Serco, Inc., 530 F.3d 1224, 1228 (10th Cir. 2008) (civilian military recruiters who did not obtain commitments from recruits were not outside salesmen within the meaning of, e.g., 29 C.F.R. § 541.504); Wirtz v. Keystone Readers Service, Inc., 418 F.2d 249, 253, 260 (5th Cir. 1969) ("student salesmen" were not outside sales employees where their promotional activities were incidental to sales made by others).

We think it clear that the above regulations, defining the term "sale" as involving a transfer of title, and defining and delimiting the term "outside salesman" in connection with an employee's efforts to promote the employer's products, do far more than merely parrot the language of the FLSA. The Secretary's interpretations of her regulations are thus entitled to "controlling" deference unless those interpretations are "'plainly

erroneous or inconsistent with the regulation.'" Auer, 519 U.S. at 461 (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359 (1989) (other internal quotation marks omitted)).

We find no such inconsistency and see no such error. Although Novartis contends that the position taken by the Secretary as amicus on this appeal is contrary to the regulations, we disagree. The basic premise of the regulations explaining who may properly be considered an exempt "outside salesman"--a term for which the FLSA explicitly relies on the Secretary to promulgate defining and delimiting regulations--is that an employee is not an outside salesman unless he does "in some sense make the sales," 2004 Final Rule at 22162. And although that phrase (on which Novartis relies heavily (see, e.g., Novartis brief on appeal at 12, 22, 25, 29)) does not appear in any of the regulations that explicate the term "outside salesman," the regulations quoted above make it clear that a person who merely promotes a product that will be sold by another person does not, in any sense intended by the regulations, make the sale. The position taken by the Secretary on this appeal is that when an employee promotes to a physician a pharmaceutical that may thereafter be purchased by a patient from a pharmacy if the physician--who cannot lawfully give a binding commitment to do so--prescribes it, the employee does not in any sense make the sale. Thus, the interpretation of the regulations given by the Secretary in her position as amicus on this appeal is entirely consistent with the regulations.

- 23 -

Nor can we conclude that the regulations constitute an erroneous interpretation of the FLSA definition of "sale" to "include[] any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition," 29 U.S.C. § 203(k). Although the phrase "other disposition" is a catch-all that could have an expansive connotation, we see no error in the regulations' requirement that any such "other disposition" be "in some sense a sale." Such an ejusdem generis-type interpretation is consistent with the interpretive canon that exemptions to remedial statutes such as the FLSA are to be read narrowly, see Arnold, 361 U.S. at 392; see generally A.H. Phillips, Inc. v. Walling, 324 U.S. 490, 493 (1945), and is neither erroneous nor unreasonable, see, e.g., Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984). We accordingly owe the Secretary's interpretation deference, and we turn to the question of its applicability to the present cases.

There is no genuine dispute over the sales path generally traversed by Novartis pharmaceuticals. As described in Part I.A. above, Novartis sells its drugs to wholesalers; the wholesalers then sell them to pharmacies; and the pharmacies ultimately sell the drugs to patients who have prescriptions for them. The Reps promote the drugs to the physicians; the Reps do not speak to the wholesalers or to the pharmacies or to the patients.

Nor is there any dispute as to what occurs during the Reps' "sales" calls on physicians. The meetings are brief--generally less than five minutes--and the physicians neither buy

- 24 -

pharmaceuticals from the Reps nor commit to buying anything from the Reps or from Novartis. The Reps may give physicians free samples, but the Reps cannot transfer ownership of any quantity of the drug in exchange for anything of value. The physician is of course an essential step in the path that leads to the ultimate sale of a Novartis product to an end user; a patient cannot purchase the product from a pharmacy without a prescription, and it is the physician who must be persuaded that a particular Novartis drug may appropriately be prescribed for a particular patient. But it is reasonable to view what occurs between the physicians and the Reps as less than a "sale."

Novartis suggests that "sale" should be read broadly in light of the statement in the Preamble that "'[e]mployees have a primary duty of making sales if they "obtain a commitment to buy" from the customer and are credited with the sale.'" (Novartis brief on appeal at 23 (quoting 2004 Final Rule at 22162) (emphases in brief).) It argues that the Reps "make sales in some sense" because "they are responsible for eliciting commitments from the physicians on whom they call to write prescriptions for NPC drugs and that these prescriptions are, in essence, orders for NPC drugs to be used by the patients in purchasing the drugs from pharmacies." (Novartis brief on appeal at 25-26 (emphasis in original) (internal quotation marks omitted).) Novartis's emphatic reliance on the word "commitments," however, does not lead to a conclusion that the Reps make sales, for it ignores the nature of the "commitment" expressly envisioned by the Secretary

in enacting the regulations: "a commitment to buy," 2004 Final Rule at 22162, 22163 (emphasis added). The type of "commitment" the Reps seek and sometimes receive from physicians is not a commitment "to buy" and is not even a binding commitment to prescribe. As the district court noted, "physicians have an ethical obligation to prescribe only drugs suitable for their patients' medical needs, meaning that they cannot make a binding commitment to a Rep to prescribe" a particular Novartis product. Novartis I, 593 F.Supp.2d at 650 (emphasis added). Thus, although physicians may say that they will prescribe a given Novartis drug for patients with appropriate diagnoses, such an assurance is not a binding commitment, and physicians remain entirely free to prescribe a competing product made by a company other than Novartis.

In sum, where the employee promotes a pharmaceutical product to a physician but can transfer to the physician nothing more than free samples and cannot lawfully transfer ownership of any quantity of the drug in exchange for anything of value, cannot lawfully take an order for its purchase, and cannot lawfully even obtain from the physician a binding commitment to prescribe it, we conclude that it is not plainly erroneous to conclude that the employee has not in any sense, within the meaning of the statute or the regulations, made a sale.

Novartis points out that a number of district courts have held that pharmaceutical sales representatives are exempt from the FLSA overtime pay requirements as outside salesmen (and/or

- 26 -

administrative employees). Those cases are, of course, not binding on us, and their reasoning does not persuade us that the Secretary's interpretations of the regulations should be disregarded. To the extent that the pharmaceuticals industry wishes to have the concept of "sales" expanded to include the promotional activities at issue here, it should direct its efforts to Congress, not the courts. Given the existing statute and regulations, we conclude that the district court should have ruled that the Reps are not outside salesmen within the meaning of the FLSA and the regulations.

C. The "Administrative" Employee Exemption

The Secretary's regulations interpreting the FLSA exemption for "any employee employed in a bona fide . . . administrative . . . capacity," 29 U.S.C. § 213(a)(1), establish three criteria that must be met for an employee to fit within that category. To be such an "administrative" employee, (1) the employee must earn at least $455 a week, (2) his "primary duty" must be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and (3) his "primary duty" must "include[] the exercise of discretion and independent judgment with respect to matters of significance," 29 C.F.R. § 541.200(a); see, e.g., id. § 541.201 (elaborating on the second criterion); id. § 541.202 (elaborating on the third criterion). For purposes of this appeal, the relevant issue is whether

Novartis has adduced sufficient evidence to permit a rational juror to infer that the Reps meet the third criterion.

With respect to the requirement that the employee's primary duty include "the exercise of discretion and independent judgment with respect to matters of significance," the regulations provide, in relevant part, as follows:

> In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.

> (b) The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

> . . . .

> (e) The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources. . . .

Id. § 541.202(a), (b), and (e).

On appeal, the Reps contend that they do "low-level, discretionless marketing work, strictly controlled by Novartis," and that their duties and authority do not satisfy the requirements for applicability of the administrative employee exemption. (Plaintiffs' brief on appeal at 40.) Novartis, in contending that the Reps exercise discretion and independent judgment, argues that the Reps, for example, "must determine how best to develop a rapport with a physician and develop strategies to engage physicians in an interactive dialogue to draw out their patient concerns, treatment styles and predilections"; must "be able to react to expressed physician concerns by emphasizing particular clinical findings regarding the efficacy and safety of NPC's drugs for specific patient types"; "must determine when and how to deliver the [Novartis-determined core] message, taking into consideration," e.g., "the prior call history with each physician, the physician's time constraints, expressed concerns, prescription-writing tendencies and patient population"; and must "determine how best to close each call by evaluating whether sufficient groundwork has been laid to seek the physician's commitment on that call to write prescriptions." (Novartis brief on appeal at 50-51.)

- 29 -

The Secretary points out that the regulations make clear that the requirement for authority to "exercise . . . discretion and independent judgment" means more than simply the need to use skill in applying well-established techniques or procedures prescribed by the employer, see 29 C.F.R. § 541.202(e). The Secretary takes the position that for the administrative exemption to apply to the Reps, the regulations require a showing of a greater degree of discretion, and more authority to use independent judgment in matters of significance, than Novartis allows the Reps. Again we find it appropriate to defer to the Secretary's interpretation.

Comparing the record as to the Reps' primary duties against the illustrative factors set out in § 541.202(b), for example, we see no evidence in the record that the Reps have any authority to formulate, affect, interpret, or implement Novartis's management policies or its operating practices, or that they are involved in planning Novartis's long-term or short-term business objectives, or that they carry out major assignments in conducting the operations of Novartis's business, or that they have any authority to commit Novartis in matters that have significant financial impact. Although Novartis argues that the Reps do commit Novartis financially when they enter into contracts with hotels, restaurants, and other venues for promotional events, "which may cost NPC thousands of dollars" (Novartis brief on appeal at 3-4), the record reveals that the Reps have been given budgets for such events by the Novartis managers and that the Reps

have no discretion to exceed those budgets. Nor have we been pointed to any evidence that the Reps have authority to negotiate and bind Novartis on any significant matters, or have authority to waive or deviate from Novartis's established policies and procedures without its prior approval. What Novartis characterizes as the Reps' exercise of discretion and independent judgment--ability to answer questions about the product, ability to develop a rapport with a physician who has a certain social style, ability to remember past conversations with a given physician, ability to recognize when a message has been persuasive--are skills gained and/or honed in their Novartis training sessions. As described in Part I.A. above, these skills are exercised within severe limits imposed by Novartis. Thus, it is undisputed that the Reps, <u>inter alia</u>,

- have no role in planning Novartis's marketing strategy;

- have no role in formulating the "core messages" they deliver to physicians;

- are required to visit a given physician a certain number of times per trimester as established by Novartis;

- are required to promote a given drug a certain number of times per trimester as established by Novartis;

- are required to hold at least the number of promotional events ordered by Novartis;

- are not allowed to deviate from the promotional "core messages";

- and are forbidden to answer any question for which they have not been scripted.

Novartis argues that the Reps exercise a great deal of discretion because they are free to decide in what order to visit

- 31 -

physicians' offices, free to decide how best to gain access to those offices, free to decide how to allocate their Novartis budgets for promotional events, and free to determine how to allocate their samples. (See Novartis brief on appeal at 51.) In light of the above controls to which Novartis subjects the Reps, we agree with the Secretary that the four freedoms advanced by Novartis do not show that the Reps are sufficiently allowed to exercise either discretion or independent judgment in the performance of their primary duties. Accordingly, we conclude that the district court should have ruled that the Reps are not bona fide administrative employees within the meaning of the FLSA and the regulations.

D.   State Law

        The district court concluded that the overtime wage requirements of New York law and California law are not meaningfully different from the requirements of the FLSA, see Novartis I, 593 F. Supp. 2d at 654, 658, and no party has argued on this appeal that the requirements differ. Accordingly, we also vacate the district court's rulings that the Reps fall within the exemptions provided by state law.

CONCLUSION

        We have considered all of Novartis's arguments in support of the judgment and have found in them no merit. We vacate the

- 32 -

judgment of the district court and remand for further proceedings not inconsistent with this opinion.