**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL SHANE CHRISTOPHER;
FRANK BUCHANAN, individually and
on behalf of all others similarly
situated,
     *Plaintiffs-Appellants,*

v.

SMITHKLINE BEECHAM
CORPORATION, DBA
GlaxoSmithKline,
     *Defendant-Appellee.*

No. 10-15257

D.C. No.
2:08-cv-01498-FJM

OPINION

Appeal from the United States District Court
for the District of Arizona
Frederick J. Martone, District Judge, Presiding

Argued and Submitted
November 3, 2010—Pasadena, California

Filed February 14, 2011

Before: Mary M. Schroeder, Richard C. Tallman, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

---

**COUNSEL**

Michael R. Pruitt, Esq.; Christine F. Crockett, Esq., Jackson White, P.C., Mesa, Arizona, for plaintiffs-appellants Michael Christopher and Frank Buchanan.

Neal D. Mollen, Esq.; Barbara L. Johnson, Esq., Paul Hastings Janofsky & Walker, L.L.P., Los Angeles, California, for defendant-appellee SmithKline Beecham Corporation.

---

**OPINION**

M. SMITH, Circuit Judge:

Plaintiffs-Appellants Michael Christopher and Frank Buchanan appeal the judgment of the district court that they are not entitled to overtime pay under the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. §§ 201 *et seq.* Plaintiffs were employed as Pharmaceutical Sales Representatives

(PSRs) for Defendant-Appellee SmithKline Beecham Corporation d/b/a GlaxoSmithKline (Glaxo). Glaxo classified Plaintiffs as "outside salesmen"—a legal designation that exempts an employee from the FLSA's overtime-pay requirement. Plaintiffs' suit challenges Glaxo's classification and seeks back pay.

The district court granted summary judgment to Glaxo. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   Pharmaceutical Sales Representatives

Glaxo is in the business of developing, producing, marketing, and selling pharmaceutical products. Christopher and Buchanan began working as PSRs for Glaxo in 2003. Glaxo terminated Christopher in May 2007. Buchanan's career at Glaxo ended when he accepted a PSR position at another pharmaceutical company. Since the enactment of the Pure Food and Drug Act of 1906, Pub. L. No. 59-384, 34 Stat. 768, federal law has, to varying degrees, regulated and influenced the sale of pharmaceuticals.[1] In 1938, the Federal Food, Drug, and Cosmetic Act, Pub. L. 75-717, 52 Stat. 1040 (codified as amended at 21 U.S.C. §§ 301 *et seq.*), clothed the Food and Drug Administration with broad regulatory authority over, *inter alia*, drug manufacturers.[2] The Durham-Humphrey Amendment of 1951 established the first comprehensive scheme governing the sale of prescription pharmaceuticals to the public. *See* Pub. L. No. 82-215, 65 Stat. 648 (1951) (codified at 21 U.S.C. § 353(b)). Importantly, for our purposes, Durham-Humphrey formalized the now well-established dis-

---

[1]*Cf.* Francis B. Palumbo & C. Daniel Mullins, *The Development of Direct-to-Consumer Prescription Drug Advertising Regulation*, 57 Food & Drug L.J. 423, 424-27 (2002).

[2]*See* Palumbo & Mullins, *supra*, at 425 & n.17.

tinction between prescription and over-the-counter drugs.[3] The Controlled Substances Act of 1970, Pub. L. 91-513, 84 Stat. 1260, continues the prescription/non-prescription dichotomy, and prohibits dispensing the former without the authorization of a "practitioner, other than a pharmacist, to an ultimate user." 21 U.S.C. § 829(b)-(d). Currently, all pharmaceuticals requiring a physician's prescription are branded "Rx only." 21 U.S.C. § 353(b)(4)(A).

We analyze this case within the framework of how Glaxo sells its "Rx only" products to an "ultimate user." A key, undisputed fact underlying our analysis is that the ultimate user—the patient—cannot purchase a prescription drug without first obtaining a physician's authorization.

Because Glaxo is proscribed from selling Rx-only products directly to the public, it sells its prescription pharmaceuticals to distributors or retail pharmacies, which then dispense those products to the ultimate user, as authorized by a licensed physician's prescription. In this restrictive sales environment, Glaxo employs PSRs to make "calls" on physicians to encourage them to prescribe Glaxo products. On calls, PSRs typically present physicians with a variety of information about Glaxo products, provide product samples, and attempt to convince the physicians to prescribe Glaxo products, when medically appropriate, over competitor products. PSRs also try to build business relationships with physicians, respond to their concerns, and recruit them to attend Glaxo-organized dinners and conventions. Each PSR is responsible for a particular "drug bag" of medications he or she tries to induce physicians to prescribe. As perceived by the Plaintiffs, the primary duty of a PSR is to communicate features and benefits of Glaxo products to physicians. In Buchanan's words, he tried to "convince prescribers that the benefits of [Glaxo's] products warranted them prescribing that product to the appropriate patient."

---

[3]*See* Palumbo & Mullins, *supra*, at 426.

PSRs usually work outside of a Glaxo office and spend much of their time traveling to the offices of, and working with, physicians within their assigned geographic territories. Plaintiffs visited between eight and ten physicians each day, usually between the hours of 8:30 a.m. and 5:00 p.m. Plaintiffs claim that they worked between ten and twenty hours each week outside of normal business hours, for which they received no overtime wages. When not making calls on physicians, Plaintiffs studied Glaxo products and relevant disease states, prepared new presentation modules, answered phone calls, checked email, generated reports, and attended events on evenings and weekends.

Before a PSR makes his or her daily calls, Glaxo provides him or her with detailed reports about the physicians he or she will visit. These reports include information about a physician's prescribing habits and drug preferences, the market volume of Glaxo products prescribed by the physician versus the volume of competitor products, and the volume of prescriptions filled in a particular region. Glaxo also provides each PSR with a budget to use for speaker programs and to engage socially with physicians.

Glaxo prepares and provides information about its products —called "Core Messages"—for PSRs to present to physicians during calls. Core Messages include information about product benefits and risks, dosage instructions, and the types of patients for whom Glaxo recommends each product. Glaxo expects PSRs to use the Core Messages and then "[d]evelop and deliver informative sales presentations based on customer needs."

PSRs do not carry any prescriptions with them for direct sale; rather, Glaxo provides PSRs with small amounts of sample products to distribute to physicians. PSRs do not contact patients or market anything to them. To the contrary, in compliance with federal law, PSRs cannot sell the samples, take

orders for any medication, or negotiate drug prices or contracts with either physicians or patients.

Glaxo recruits applicants who have prior sales experience for its PSR positions. When Glaxo hires new PSRs, it provides them with more than one month of training that focuses on making presentations, learning about Glaxo products, and building interpersonal skills. PSRs are taught how to ask for a commitment from a physician to prescribe Glaxo products if the physician believes the medication is appropriate.

Since 2001, Glaxo has instructed PSRs on various methods of completing a call. When Plaintiffs were hired, they received training in Glaxo's "Assertive Selling Always Professional (ASAP)" model. They were also trained to follow Glaxo's "Winning Practices" program. ASAP and Winning Practices are similarly structured and emphasize that a PSR should: (1) analyze and understand what is happening in an assigned region; (2) work with the team to drive results; (3) master professional knowledge to understand clinical management of patients; (4) prepare for calls; (5) "Sell Through Customer-Focused Dialogue"; (6) obtain the strongest commitment possible from a healthcare professional at the end of the call; and (7) provide added value to the customer relationship.

In 2004, Glaxo started a new program called "When? Why? How?" which distilled the old model into three questions PSRs should use to bond the targeted physician to the Glaxo brand: "(1) When should I use this product? (2) Why should I use this product? (3) How should I use this product?" PSRs strive to ensure that their targeted physicians have the answers to all three questions before PSRs leave the physicians' offices.

Plaintiffs received two types of pay—salary and incentive-based compensation. Incentive-based compensation is paid if Glaxo's market share for a particular product increases in a

PSR's territory, sales volume for a product increases, sales revenue increases, or the dose volume increases. Glaxo aims to have a PSR's total compensation be approximately 75% salary and 25% incentive compensation.[4] However, the dollar value of incentive-based compensation is uncapped.

The process of providing information to physicians is referred to within the pharmaceutical industry as "detailing," and PSRs have traditionally been known by the moniker "detail men" or "detailers." Plaintiffs' job functions during their tenures at Glaxo varied little from those of their predecessors of fifty or sixty years ago.[5] Moreover, there is homogeneity

---

[4]In 2004, Christopher received $72,576 gross pay, of which $29,993 was incentive compensation (41% of gross); in 2005, he received $67,243, of which $21,231 was incentive (32% of gross); and in 2006, he received $77,552, of which $28,249 was incentive (37% of gross).

In 2004, Buchanan received $70,740 gross pay, of which $19,232 was incentive compensation (27% of gross); in 2005, he received $74,358, of which $27,743 was incentive (32% of gross); in 2006, he received $84,932, of which $32,519 was incentive (38% of gross); and in 2007, he received $75,776, of which $19,957 was incentive (26% of gross).

[5]*See* Thomas L. Hafemeister, et ano., *Beware Those Bearing Gifts: Physician's Fiduciary Duty to Avoid Pharmaceutical Marketing*, 57 U. Kan. L. Rev. 491, 493-94 (2009) ("Detailing is the term used to denote the practice of pharmaceutical representatives visiting the offices of physicians or otherwise contacting physicians to promote their company's drugs and/or medical devices."). The pharmaceutical-representative/detailist position has deep roots in the industry, dating back until at least the 1930s. *See* Lars Noah, *Death of a Salesman: To What Extent Can the FDA Regulate the Promotional Statements of Pharmaceutical Sales Representatives*, 47 Food & Drug L.J. 309, 311 (1992) ("During the 1930s, . . . [m]arketing efforts by salesmen therefore focused almost exclusively on retail pharmacies."). Indeed, we trace the first mention of detail men in the federal case reports to 1940. *See United States v. Fifty-Nine Tubes, More or Less, of Lutein Tablets*, 32 F. Supp. 958, 960 (S.D.N.Y. 1940) (describing how "detail men or salesmen" interacted with physicians); *see also Motus v. Pfizer, Inc.*, 358 F.3d 659, 661 (9th Cir. 2004) (referring to "Pfizer's detail men" providing drug information to a physician); *N. Cal. Pharm. Ass'n v. United States*, 306 F.2d 379, 386 (9th Cir. 1962) (" 'Detail men,' or local sales representatives of the out-of-state manufacturers are constantly at

within the industry—PSRs carry out essentially the same business functions regardless of which drug manufacturers they represent.[6]

The pharmaceutical industry self-regulates PSRs and their contacts with physicians by way of a voluntary industry-wide code of conduct—the Pharmaceutical Research and Manufacturers of America (PhRMA) Code. The PhRMA Code does not speak of selling, but, rather, provides that "[i]nteractions [with health care professionals] should be focused on informing [them] about products, providing scientific and educational information, and supporting medical research and education." The PhRMA Code refers to PSRs as "industry representatives" and states that "[i]nformational presentations and discussions by industry representatives speaking on behalf of a company provide valuable scientific and educational benefits." The PhRMA Code also regulates the provision of meals and gifts to physicians and professes an industry commitment to independent medical decisionmaking.

---

work in northern California acquainting physicians and pharmacists with new drugs, stimulating interest generally in the firm's products, and urging physicians to prescribe, and pharmacists to order, the manufacturer's goods."); *Schering Corp. v. Sun Ray Drug Co.*, 320 F.2d 72, 74 (3d Cir. 1963) (explaining company's advertising included "efforts on the part of its detail men (who are salesmen)"); *Hoffmann-La Roche, Inc. v. Schwegmann Bros. Giant Super Mkts.*, 122 F. Supp. 781, 783 (E.D. La. 1954) ("[Detail men] regularly call upon physicians . . .").

[6] *See e.g.*, *IMS Health, Inc. v. Mills*, 616 F.3d 7, 14 (1st Cir. 2010) ("Detailing is a massive and expensive undertaking for pharmaceutical manufacturers, which spend billions of dollars a year to have some 90,000 pharmaceutical sales representatives make weekly or monthly one-on-one visits to prescribers nationwide."); *Pfizer, Inc. v. Astra Pharm. Prods., Inc.*, 858 F. Supp. 1305, 1314 (S.D.N.Y. 1994) ("It is not disputed that the parties' marketing efforts are conducted in substantially similar ways through (a) advertising in medical journals, (b) mailings sent to doctors, and (c) the use of large forces of 'detail men' who solicit doctors at the latter's offices and discuss their products directly with the doctors.").

## II. Proceedings in the District Court

This litigation commenced in August 2008, when Plaintiffs filed the Complaint challenging Glaxo's practice of requiring overtime work without paying additional compensation as a violation of 29 U.S.C. §§ 207(a)(1), 216(b). The parties cross-moved for summary judgment, and Plaintiffs moved to certify a conditional class. Glaxo contended that Plaintiffs were exempt under the "outside salesman" provision in FLSA or, alternatively, under the "administrative" exemption. 29 U.S.C. § 213(a)(1).

In granting Glaxo's motion for summary judgment, the district court addressed only the outside sales exemption and held that PSRs "unmistakably fit within the terms and spirit of the exemption." *Christopher v. SmithKlein Beecham Corp.*, No. 08 Civ. 1498 (FJM), 2009 WL 4051075, at *5 (D. Ariz. Nov. 20, 2009). The court observed that PSRs "are not hourly workers, but instead earn salaries well above minimum wage —up to $100,000 a year," and that they receive bonuses in lieu of overtime as "an incentive to increase their efforts." *Id.* The district court continued, "A PSR's ultimate goal is to close an encounter with a physician by obtaining a non-binding commitment from the physician to prescribe the PSR's assigned product. In this highly regulated industry, that is the most a PSR can achieve." *Id.*

Thereafter, Plaintiffs moved to alter or amend the judgment based on the district court's failure to consider an *amicus* brief filed by the Secretary (Secretary) of the Department of Labor (DOL) in a FLSA appeal then pending before the United States Court of Appeals for the Second Circuit, *In re Novartis Wage & Hour Litig.*, 611 F.3d 141 (2d Cir. 2010). The district court rejected Plaintiffs' argument that the DOL brief was entitled to deference under either *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), or *Auer v. Robbins*, 519 U.S. 452 (1997), and noted that the DOL's brief recapitulated the points argued at summary judg-

ment. Finding the DOL's "current interpretation inconsistent with the statutory language and its prior pronouncements, [and] [ ] also def[ying] common sense," the district court denied the motion to amend the judgment. Plaintiffs appeal.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291.

We review a district court's interpretation of the FLSA and its grant of summary judgment de novo. *Gieg v. DDR, Inc.*, 407 F.3d 1038, 1044-45 (9th Cir. 2005); *see also Dent v. Cox Commc'ns Las Vegas, Inc.*, 502 F.3d 1141, 1143 (9th Cir. 2007). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

## DISCUSSION

## I.   The FLSA Outside Sales Exemption

The FLSA imposes minimum labor standards on employers to promote "the health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a); *Nigg v. U.S. Postal Serv.*, 555 F.3d 781, 784 (9th Cir. 2009). The FLSA was "enacted because Congress found that the existence 'in industries engaged in commerce or in the production of goods for commerce' of labor conditions detrimental to maintaining minimum standards of living necessary for health, efficiency and general well-being of workers perpetuates substandard conditions among workers, burdens commerce, constitutes an unfair method of competition in commerce, leads to labor disputes, and interferes with the orderly and fair marketing of goods." *Hale v. Arizona*, 993 F.2d 1387, 1396 (9th Cir. 1993)

(en banc) (quoting 29 U.S.C. § 202(a)) (emphasis added); *see also Nigg*, 555 F.3d at 784.

[1] To meet those goals and expand employment opportunities across the economy, the FLSA includes a baseline "overtime payment requirement" that employers must pay employees "a rate not less than one and one-half times the regular rate at which he is employed" for hours worked in excess of forty per week. 29 U.S.C. § 207(a)(1). There are numerous exceptions to this general rule. *See* 29 U.S.C. § 213. These exemptions to the overtime-pay requirement vary widely from "white-collar" executive, administrative, and professional exemptions to those for babysitters. 29 U.S.C. § 213(a)(1), (15). Relevant here is one part of the "white-collar" exemption for persons employed "in the capacity of outside salesman." 29 U.S.C. § 213(a)(1); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009). The white-collar exemption removes from the overtime pay requirement:

> any employee employed in a bona fide executive, administrative, or professional capacity . . . or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary [of Labor]). . . .

29 U.S.C. § 213(a)(1) (emphasis added).

As the statute indicates, a proper interpretation of the FLSA is necessarily guided by the regulations issued by the Secretary of Labor—"[t]he FLSA grants the Secretary broad authority to 'define and delimit' the scope of the exemption for executive, administrative, and professional employees." *Auer*, 519 U.S. at 456 (alterations and citation omitted). Congress did not define the term "outside salesman" or the other white-collar exemptions in the FLSA. Rather, "[p]ursuant to Congress's specific grant of rulemaking authority, the [DOL] has issued implementing regulations, at 29 C.F.R. Part 541

[(Part 541)], defining the scope of the section 13(a)(1) exemptions." *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,124 (Apr. 23, 2004). In 2004, the DOL's Wage and Hour Division promulgated supplemental rules concerning the outside sales and administrative exemptions (the 2004 Rule). Among other things, the 2004 Rule explained that "the major substantive provisions of the Part 541 regulations have remained virtually unchanged for 50 years." 69 Fed. Reg. at 22,124.

**[2]** The Secretary defines an "outside salesman" as any employee:

> (1) Whose primary duty is: (i) making sales within the meaning of section 3(k) of the Act; or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and

> (2) Who is primarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a). An employee's "primary duty" is "the principal, main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700. The outside sales regulation provides:

> In determining the primary duty of an outside sales employee, work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work. Other work that furthers the employee's sales efforts also shall be regarded as exempt work including, for example, writing sales reports, updating or

revising the employee's sales or display catalogue, planning itineraries and attending sales conferences.

29 C.F.R. § 541.500(b).

The Secretary's outside sales regulation references Section 3(k) of the Act. 29 C.F.R. § 541.500(a). Section 3(k) provides that " '[s]ale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k). The Secretary's regulations provide:

Sales within the meaning of section 3(k) of the Act include the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property. Section 3(k) of the Act states that "sale" or "sell" includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition.

29 C.F.R. § 541.501(b).

In the regulations, the Secretary draws a distinction between sales work and promoting:

Promotion work is one type of activity often performed by persons who make sales, which may or may not be exempt outside sales work, depending upon the circumstances under which it is performed. Promotional work that is actually performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work. On the other hand, promotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work.

29 C.F.R. § 541.503(a). To illustrate the concept of promoting sales, as opposed to selling, the Secretary's regulations pro-

vides two examples—a manufacturer's representative and a company representative who visits chain stores:

> (b) A manufacturer's representative, for example, may perform various types of promotional activities such as putting up displays and posters, removing damaged or spoiled stock from the merchant's shelves or rearranging the merchandise. . . . Promotion activities directed toward consummation of the employee's own sales are exempt. Promotional activities designed to stimulate sales that will be made by someone else are not exempt outside sales work. . . .

> (c) Another example is a company representative who visits chain stores, arranges the merchandise on shelves, replenishes stock by replacing old with new merchandise, sets up displays and consults with the store manager when inventory runs low, but does not obtain a commitment for additional purchases. The arrangement of merchandise on the shelves or the replenishing of stock is not exempt work unless it is incidental to and in conjunction with the employee's own outside sales. Because the employee in this instance does not consummate the sale nor direct efforts toward the consummation of a sale, the work is not exempt outside sales work.

29 C.F.R. § 541.503(b)-(c).

In a FLSA overtime-wage case, the question of how an employee spends his or her workday is one of fact, while the question of whether his or her activities exclude him or her from the overtime-pay requirement is one of law. *See Icicle Seafoods v. Worthington*, 475 U.S. 709, 714 (1986); *Bratt v. Cnty. of Los Angeles*, 912 F.2d 1066, 1068 (9th Cir. 1990). Although the outside sales exemption is more than seven decades old, our encounters with the exemption are few and lim-

ited to the class-certification context. *See In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953 (9th Cir. 2009); *Vinole*, 571 F.3d at 939, 945. Thus, whether a PSR's job duties make him or her an outside salesperson is a question of first impression for our court.

We construe the outside sales exemption consistent with other Section 13(a) exemptions under the FLSA. The employer always has the burden of showing the exemption applies to its employee. *Bratt*, 912 F.2d at 1069; *see also Nigg*, 555 F.3d at 788. The exemption can only apply to persons "plainly and unmistakably within [its] terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *Klem v. Cnty. of Santa Clara*, 208 F.3d 1085, 1089 (9th Cir. 2000). Because exemptions are "narrowly construed" against the employer, to meet its burden, an employer must establish that the employee satisfies *each* of the criteria set forth in the Secretary of Labor's regulations. *See Bratt*, 912 F.2d at 1069; *see also Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 751 (9th Cir. 2010). Reviewing a FLSA exemption is well understood to be "a fact-intensive" inquiry. *Vinole*, 571 F.3d at 945 (citation omitted).

## II.   Whether Deference to the Secretary's Position is Appropriate

[3] The Secretary's appearance as *amicus* supporting Plaintiffs requires us to determine what, if any, deference we must accord to her view that PSRs do not meet the primary duties test for the outside sales exemption. The Secretary also advocated this construction of the regulations before the Second Circuit in *Novartis*. 611 F.3d at 149. Although the *Novartis* court held that Secretary's interpretation was owed *Auer* deference, 611 F.3d at 153, our review of the relevant authorities leads us to a different conclusion. We conclude that we owe no deference to the Secretary's current interpretation of the regulations, and, in any event, we respectfully disagree with that interpretation.

### A.   Administrative Deference in the FLSA

When a question arises as to the meaning of the FLSA or the Secretary's regulations, we apply traditional rules of construction and, where required, administrative deference. *See, e.g.*, *Webster v. Pub. Sch. Emp. of Wash., Inc.*, 247 F.3d 910, 915 (9th Cir. 2001) (citing *Auer*, 519 U.S. at 457). Thus, if the language of a statute or regulation is unambiguous, we apply the terms as written. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000) ("[D]eference is warranted only when the language of the regulation is ambiguous."); *Chevron,* 467 U.S. at 842-43 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). By contrast, when Congress has *not* "directly spoken to the precise question at issue," *Auer*, 519 U.S. at 457, we will defer to the Secretary's regulation "so long as it is 'based on a permissible construction of the statute.' " *Id.* (citing *Chevron*, 467 U.S. at 842-43). If the Secretary's regulations are themselves ambiguous, and the Secretary uses her rule-making authority to provide clarity, we give controlling deference to the Secretary's view unless it is "plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461 (citation and internal quotation mark omitted); *see also Christensen*, 529 U.S. at 586-87, 588 ("*Auer* deference is warranted only when the language of the regulation is ambiguous."); *cf. In re Farmers Ins. Exch., Claims Representatives' Overtime Pay Litig.*, 481 F.3d 1119, 1129 (9th Cir. 2007) ("We must give deference to the DOL's interpretation of its own regulations through, for example, Opinion Letters."). Lastly, if the Secretary interprets an *unambiguous* statute by way of an opinion letter, enforcement guidelines, or the like, her opinion is merely "entitled to respect" to the extent the interpretation has the "power to persuade" the court. *See Christensen*, 529 U.S. at 587 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

**B.** *In re Novartis Wage & Hour Litigation*

In *Novartis*, the Second Circuit held that PSRs did not meet the requirements of the outside sales exemption. As it has done here, the DOL took the position that "when an employee promotes to a physician a pharmaceutical that may thereafter be purchased by a patient from a pharmacy . . . the employee does not in any sense make the sale." *Novartis*, 611 F.3d at 153. In reviewing the Secretary's position, the Second Circuit laid out the relevant statutory and regulatory history and focused its attention on the Secretary's regulations, and, in particular, the Preamble in the 2004 Rule which "emphasized that no one could be considered a salesman within these regulations unless he in some sense made a sale." *Id.* at 152. The *Novartis* court highlighted a series of comment letters sent to the DOL by manufacturers' associations and industry trade groups that had requested "the Department [ ] eliminate the emphasis upon an employee's 'own' sales . . . because of team selling, customer control of order processing, and increasing computerization of sales and purchasing activities. . . ." 69 Fed. Reg. at 22,162. The United States Chamber of Commerce emphasized that "promotional activities, even when they do not culminate in an individual sale, are nonetheless an integral part of the sales process." *Id.* Based on these concerns, the DOL made a "minor change" to "address commenter concerns that technological changes in how orders are taken and processed should not preclude the exemption for employees whose primary duty is making sales." *Id.* The 2004 Rule continues: "[T]he Department does not intend to change any of the essential elements required for the outside sales exemption, including the requirement that the outside sales employee's primary duty must be to make sales or to obtain orders or contracts for services. An employer cannot meet this requirement unless it demonstrates objectively that the employee, in some sense, has made sales." *Id.*

The *Novartis* court also quoted the Preamble's elaboration of the primary-duty standard: "*Employees have a primary*

*duty of making sales if they 'obtain a commitment to buy' from the customer* and are credited with the sale.' " 611 F.3d at 152 (quoting 69 Fed. Reg. at 22,162) (emphasis in original). The Secretary's interpretation is based on a 1949 DOL interpretation, which provided: "In borderline cases the test is whether the person is actually engaged in activities directed toward the consummation of his own sales, at least to the extent of obtaining a commitment to buy from the person to whom he is selling. If his efforts are directed toward stimulating the sales of his company generally rather than the consummation of his own specific sales his activities are not exempt." 69 Fed. Reg. at 22,162-63 (citation omitted).

The Second Circuit determined that the Secretary's regulations "do far more than merely parrot the language of the FLSA." *Novartis*, 611 F.3d at 153. For that reason, "the Secretary's interpretations of her regulations are [ ] entitled to 'controlling' deference unless those interpretations are 'plainly erroneous or inconsistent with the regulation.' " *Id.* (quoting *Auer*, 519 U.S. at 461 (internal quotation omitted)). The *Novartis* court could find no inconsistencies or errors in the Secretary's *amicus* position. *Id.* The court stated it did not believe the distribution practices of the drug company constituted an "other disposition," as that term is used in the FLSA. Rather, the court said that because "other disposition" followed a line of words which, apparently, emphasized "a sale" being consummated, "other disposition" was not intended as a "catch-all" category. *Id.* Ultimately, the *Novartis* court summarized its reasoning:

> [W]here the employee promotes a pharmaceutical product to a physician but can transfer to the physician nothing more than free samples and cannot lawfully transfer ownership of any quantity of the drug in exchange for anything of value, cannot lawfully take an order for its purchase, and cannot lawfully even obtain from the physician a binding commitment to prescribe it, we conclude that it is not plainly

erroneous to conclude that the employee has not in any sense, within the meaning of the statute or the regulations, made a sale.

*Id.* at 154.

## C.  Deference Owed in this Case

**[4]** Our view of the level of deference we owe to the Secretary in this matter is best captured by the Supreme Court's instruction in *Gonzales v. Oregon*: "An agency does not acquire special authority to interpret its own words when, instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language." 546 U.S. 243, 257 (2006); *see also Chase Bank USA, N.A. v. McCoy*, 562 U.S. ___, (slip op. at 15) (Jan. 24, 2011) ("Accordingly, no deference was warranted to an agency interpretation of what were, in fact, Congress' words."); *N. Cal. River Watch v. Wilcox*, 620 F.3d 1075, 1088 (9th Cir. 2010) ("Here, the three rules cited by the United States essentially parrot the statutory language."). The "parroting" with which the *Gonzales* Court took issue is present in the Secretary's interpretation of Section 3(k).

According to the Secretary's regulations, a salesman is someone who either "mak[es] sales within the meaning of section 3(k) of the Act" or someone who "obtain[s] orders or contracts." 29 C.F.R. 541.500(a)(1). Since there is no dispute that PSRs do not obtain orders for anything, only the "sales" element is relevant here. To define "sales within the meaning of section 3(k)," we look to 29 C.F.R. § 541.501(b), which provides that "[s]ales within the meaning of section 3(k) of the Act include the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property." Section 3(k) of the Act states that " '[s]ale'" or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k). Thus, the Secretary has given us two mean-

ings with which to set the boundaries of the sales exemption. First, in 29 C.F.R. § 541.501(b), the Secretary provides an open-ended definition that sales, unsurprisingly, "include the transfer of title to tangible property." In the next sentence, the Secretary cross-references back to the language of Section 3(k) of the Act—the very language purportedly being defined. Accordingly, the Secretary's regulations define "sale" or "sell" by statutory renvoi—that is, a "sale" means a "sale." This clarifies nothing about the meaning of Section 3(k); it merely incorporates the very undefined, very un-delimited term the Secretary seeks to clarify. A definition dependent almost entirely on Congress's seventy-two-year old statutory language is not an example of the DOL employing its "expertise" to elucidate meaning to which we owe *Auer* deference. *See N. Cal. River Watch*, 620 F.3d at 1085-87.

In *Gonzales v. Oregon*, the Supreme Court confronted an analogous situation when it rejected the Attorney General's regulatory attempt to frustrate the implementation of Oregon's Death with Dignity Act. In that case, Oregon statutory law exempted licensed physicians from liability when they prescribed medication to hasten death for terminally ill individuals. 546 U.S. at 249-54. In 2001, shortly after a change of presidential administration, the Attorney General promulgated a new interpretive rule that restricted the use of controlled substances in physician-assisted suicides. *Id.* at 254. In defending that rule, the government contended in its appeal that the judiciary was required to give "considerable deference" to the Attorney General's interpretive rule as it was "an elaboration of one of [his] own regulations." *Id.* at 256. In rejecting that contention, the Supreme Court drew meaningful distinctions with its decision in *Auer*:

> In *Auer*, the underlying regulations gave specificity to a statutory scheme the Secretary was charged with enforcing and reflected the considerable experience and expertise the [DOL] had acquired over time.

*. . . Here, on the other hand, the underlying regulation does little more than restate the terms of the statute itself.* The language the Interpretive Rule addresses comes from Congress, not the Attorney General, and the near equivalence of the statute and regulation belies the Government's argument for *Auer* deference.

*Id.* at 256-57 (emphasis added).

**[5]** The failure to add specificity to the statutory scheme that troubled the *Gonzales* Court, indeed the "parroting" of statutory language, is present in the Secretary's outside sales regulations. Rather than setting forth a particular test for "sale" or instructing employers to look for indicia of sales, the Secretary's regulations direct employers, employees, and this court back to the language of the FLSA. Given the admonition in *Gonzales*, we are unable to accord *Auer* deference to a regulation written in this manner.

**[6]** Thus, when we look to the Secretary's brief for her application of the regulations, we see only a *reinterpretation* of Section 3(k). Rather than applying the regulation to the facts presented, the Secretary has used her appearance as *amicus* to draft a new interpretation of the FLSA's language. Were we to accept the Secretary's offer, and give controlling deference even where there exists no meaningful regulatory language to interpret, we would unduly expand *Auer*'s applicability to interpretations of statutes expressed for the first time in case-by-case *amicus* filings. *See N. Cal. River Watch*, 620 F.3d at 1088 ("In this case, the *amicus* brief purports to interpret statutory, not regulatory, language."). In essence, we would sanction bypassing of the Administrative Procedures Act and notice-and-comment rulemaking. *C.f. Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) ("Here, however, we confront an interpretation contained in an opinion letter, not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking."). Accordingly, we hold

that we need not give "controlling" deference to the Secretary's interpretations in this matter.[7] Furthermore, even if *Auer* applied, deference is not warranted because the Secretary's position is both plainly erroneous and inconsistent with her own regulations and practices, as demonstrated in the analysis that follows.

### III.   "Sales" and "Selling" in the Pharmaceutical Industry

Absent an agency-determined result, it is the province of the court to construe the relevant statutes and regulations. *N. Cal. River Watch*, 620 F.3d at 1088-89. As noted *supra*, Plaintiffs argue that by not transferring any product to physicians, they are not selling pharmaceuticals, but only "promoting" them. Plaintiffs say this distinction is warranted in light of the rule that the FLSA be "narrowly construed against . . . employers." *Webster*, 247 F.3d at 914. For its part, Glaxo urges us to view "sale" in Section 3(k) in a commonsensical fashion, while contending that the meaning of "sale" is permissive. Glaxo urges us to adopt the rationale that the phrase "other disposition" in Section 3(k)'s definition of "sale" is a broad catch-all category.[8] This view was cited with approval by the district court here, and is supported by the Secretary's usage, dating back to 1940, of the language that an employee must "*in some sense* make a sale." 69 Fed. Reg. at 22,162 (quoting "Executive, Administrative, Professional Outside Salesman" Redefined, Wage and Hour Division, U.S. Dept. of Labor, Report & Recommendations of the Presiding Officer

---

[7]As explained *infra*, we likewise find unpersuasive the Secretary's interpretation of the FLSA provisions, thus vitiating any *Skidmore* deference. *See* Section III.

[8]*See* Steven I. Locke, *The Fair Labor Standards Acts Exemptions and the Pharmaceuticals Industry: Are Sales Representatives Entitled to Overtime?*, 13 Barry L. Rev. 1, 25 (2009) ("Applying these [common-usage] definitions, it is logical to conclude that the term 'other disposition,' as it is used to define a 'sale' under the Act, includes a physician's decision to write a prescription for a particular medication.").

(Harold Stein) at Hearings Preliminary to Redefinition, at 46 (Oct. 10, 1940)) (emphasis added).

**[7]** Plaintiffs' contention that they do not "sell" to doctors ignores the structure and realities of the heavily regulated pharmaceutical industry. It is undisputed that federal law prohibits pharmaceutical manufacturers from directly selling prescription medications to patients. Plaintiffs suggest that despite being hired for their sales experience, being trained in sales methods, encouraging physicians to prescribe their products, and receiving commission-based compensation tied to sales, their job cannot "in some sense" be called selling. This view ignores the reality of the nature of the work of detailers, as it has been carried out for decades. Plaintiffs' argument also fails to account for the fact that the relevant "purchasers" in the pharmaceutical industry, and the appropriate foci of our inquiry, are not the end-users of the drug but, rather, the prescribing physicians whom they importune frequently. *See, e.g.*, *Baum v. AstraZeneca LP*, 605 F. Supp. 2d 669, 678-79 (W.D. Pa. 2009) (discussing why the "professional paradigm" places the physician as the relevant decision maker in the health services industry), *aff'd on other grounds*, 372 Fed. App'x 246 (3d Cir. 2010). Unlike conventional retail sales, the patient is not at liberty to choose personally which prescription pharmaceutical he desires. As such, he cannot be fairly characterized as the "buyer." Instead, it is patient's physician, who is vested with both a moral and legal duty to prescribe medication appropriately, who selects the medication and is the appropriate focus of our "sell/buy" inquiry. In this industry, the "sale" is the exchange of non-binding commitments between the PSR and physician at the end of a successful call. Through such commitments, the manufacturer will provide an effective product and the doctor will appropriately prescribe; for all practical purposes, this is a sale. Because pharmaceutical manufacturers appreciate who the "real" buyer is, they have structured their 90,000-person sales force and their marketing tactics to accommodate this unique environment.

**[8]** When a PSR visits a doctor, he or she attempts to obtain the absolute maximum commitment from his or her "buyer"—a non-binding commitment from the physician to prescribe the PSR's assigned product when medically appropriate. In most industries, there are no firm legal barriers that prohibit the *actual physical* exchange of the goods offered for sale. Because such barriers do exist in this industry, the fact that commitments are non-binding is irrelevant; the record reveals that binding or non-binding, a physician's commitment to a PSR is nevertheless a meaningful exchange because pharmaceutical manufacturers value these commitments enough to reward a PSR with increased commissions when a physician increases his or her use of a drug in the PSR's bag. *See, e.g.*, *Baum*, 605 F. Supp. 2d at 681 ("This Court believes that other courts, and perhaps regulatory agencies, underestimate the significance of this oral commitment from physicians. In part, this error emerges from a misunderstanding of the ways in which human beings are socially and informally motivated. Sometimes lawyers and judges forget that a person's word means something; remarkably, many people do not actually need a 400-page contract to bind themselves to their word.").

Moreover, the industry has agreed upon and abides by the PhRMA Code to regulate the marketing of medicine to healthcare professionals—just as any consumer-products maker might develop rules to limit the express warranties its sales force might offer to a customer. Such industry practice and prevailing customs should inform our disposition. *Cf. Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 106 (2d Cir. 2010) (in resolving whether advertising sales director was an administrative or sales worker in the publishing industry "a careful consideration of [employer's] business model provides some clarity").

Under Plaintiffs' view, PSRs are not salespeople, despite the fact that more than 90,000 pharmaceutical representatives make daily calls on physicians for the purpose of driving

greater sales. *See IMS Health*, 616 F.3d at 14. We cannot square this view with Section 3(k)'s open-ended use of the word "sale," which *includes* "other disposition[s]." While we recognize that the FLSA is to be narrowly construed in light of its remedial nature, that general principle does not mean that every word must be given a rigid, formalistic interpretation. For example, for over seventy years, the Secretary has emphasized a sensible application of the exemptions; in the Preamble to the 2004 Rule, the Secretary employs the open-ended concept that a salesman is someone who "in some sense" sells. 69 Fed. Reg. at 22,162-63 (emphasis added). In other words, while the Secretary asks us to narrowly interpret this exemption, she herself acknowledges that technical considerations alone and changes in the way sales are made should not be grounds for denying the exemption. *See* 69 Fed. Reg. at 22,162.

To further explain our common sense understanding of why PSRs make sales, we find the paradigm "outside salesman" case *Jewel Tea Co. v. Williams*—instructive. 118 F.2d 202 (10th Cir. 1941). The importance of *Jewel Tea* is illustrated by the fact that both parties and the *amicus* offer it as favorable precedent for their conflicting positions.

*Jewel Tea* involved a FLSA overtime-wage suit brought by three employees of a tea, coffee, and sundry goods manufacturer and distributor. 118 F.2d at 203. The plaintiffs held the position of "route salesmen" to "sell and distribute" products to customers in their homes. *Id.* The area in which the company sold its goods was divided and "[e]ach salesman [was] assigned an exclusive territory which he cover[ed]." *Id.* The employees made no immediate deliveries but instead took orders for future delivery, although they might advance an item to a customer. *Id.* The company provided sales training and sent a supervisor with a new hire on early sales calls before permitting the employee to "go out on a route by himself." *Id.* at 204. Further, employees were taught a "five-point sale" method to employ when speaking with customers. *Id.* A

certain degree of knowledge about the products and potential customers was also required—"[t]he salesman must know recipes for the preparation of the Company's products . . . [and] must learn the general requirements of each family, in order to avoid over-stocking his customer and in order to anticipate the family's needs." *Id.* After working in the field during the day, employees completed some clerical tasks at night. *Id.* at 205. Finally, employees were paid a base salary plus a commission if their collections were in excess of a sum certain. *Id.*

   The *Jewel Tea* plaintiffs brought suit to collect unpaid overtime, asserting they did not fall within the "outside sales" exemption, primarily employing the argument that they were "delivery men." *Id.* at 208. In its decision denying plaintiffs overtime pay, the Tenth Circuit penned the oft-quoted justification for the outside sales exemption:

   The reasons for excluding an outside salesman are fairly apparent. Such salesman, to a great extent, works individually. There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates. In lieu of overtime, he ordinarily receives commissions as extra compensation. He works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day. To apply hourly standards primarily devised for an employee on a fixed hourly wage is incompatible with the individual character of the work of an outside salesman.

*Id.* at 207-08.

   **[9]** Reviewing the undisputed facts here, we consider the rationale for applying the outside sales exemption to PSRs to be as "apparent" as it was in *Jewel Tea*. Of course, this case

does not involve door-to-door consumer-product sales. But, the FLSA is not an industry-specific statute. As the Second Circuit recognized in *Reiseck*, not all FLSA claims will involve the "archetypal businesses envisaged by the FLSA," 591 F.3d at 106. Even though there are differences, it is notable that the salesmen in *Jewel Tea* and Plaintiffs here each (1) worked in assigned territories, (2) did not make immediate deliveries, (3) were required to analyze client backgrounds, (4) received product training, (5) employed a pre-planned routine for client interaction, (6) were accompanied by supervisors for training, (7) were later subject to minimal supervisor oversight, (8) completed clerical activities at the end of the day, and (9) had a dual salary and commission-based compensation plan tied to their performance. Even though PSRs lack some hallmarks of the classic salesman, the great bulk of their activities are the same, as is the overarching purpose of obtaining a commitment to purchase (prescribe) something.

[10] The primary duty of a PSR is not promoting Glaxo's products in general or schooling physicians in drug development. These are but preliminary steps toward the end goal of causing a particular doctor to commit to prescribing *more* of the particular drugs in the PSR's drug bag. Without this commitment and the concomitant increase in prescriptions, or drug volume, or market share—i.e. without more *sales*—the PSR would not receive his or her commission salary and could soon find himself or herself unemployed. While not all steps in the PSR's daily activities constitute "selling," that fact does not render the totality of those activities non-exempt promotion; "work performed incidental to and in conjunction with the employee's own outside sales or solicitations . . . shall be regarded as exempt outside sales work . . . [and] . . . other work that furthers the employee's sales efforts also shall be regarded as exempt work." 29 C.F.R. § 541.500(b).

The Secretary's distinction between selling and promoting is only meaningful if the employee does not engage in *any* activities that constitute "selling" under the Act. This much is

seen from the plain language of the regulations, which gives the example of promotional work as "a company representative who visits chain stores, arranges the merchandise on shelves, replenishes stock by replacing old with new merchandise, sets up displays and consults with the store manager when inventory runs low, but *does not obtain a commitment for additional purchases*." 29 C.F.R. § 541.503(c) (emphasis added). PSRs do far more than collect general data or provide consultations; indeed they ask for, and sometimes obtain, a commitment by the doctor to prescribe Glaxo drugs, and whether the doctor keeps that commitment is verified and traced using aggregated pharmacy data Glaxo collects. *See IMS Health*, 550 F.3d at 44-47 ("A valuable tool in this endeavor, available through the omnipresence of computerized technology, is knowledge of each individual physician's prescribing history.").

In *Reisick*, the Second Circuit highlighted an important distinction between selling and promoting, noting that the latter is directed to the public at large, as opposed to a particular client:

> Consider a clothing store. The individual who assists customers in finding their size of clothing or who completes the transaction at the cash register is a salesperson under the FLSA, while the individual who designs advertisements for the store or decides when to reduce prices to attract customers is an administrative employee for the purposes of the FLSA.

*Reiseck*, 591 F.3d at 107. At Glaxo, Plaintiffs had no interest in "generally" promoting sales by the company or improving sales across the board. Rather, Plaintiffs directed their sales efforts only towards certain products, only to a discrete group of physicians, and only within a defined geographic area. Targeting physicians is not based on mass appeals or general advertisements, but is the result of a personalized review of

each physician's prescribing habits and history. The process, like any sales process, is *tailored* to the customer's preferences.

[11] We also find that the Secretary's acquiescence in the sales practices of the drug industry for over seventy years further buttresses our decision. The outside sales exemption has existed since 1938. Detail men have practiced their craft over that same period. Generally, they have been considered salespeople.[9] Until the Secretary's appearance in *Novartis*, the DOL did not challenge the conventional wisdom that detailing is the functional equivalent of selling pharmaceutical products. Indeed, the DOL has recognized as much in its Dictionary of Occupation Titles, which provides the following definition for pharmaceutical detailers:

---

[9]*See N. Cal. Pharm.*, 306 F.2d at 386 (9th Cir. 1962) (" 'Detail men,' or local sales representatives. . ."); *see also IMS Health*, 550 F.3d at 54 ("In the service of *maximizing drug sales*, detailers use prescribing histories as a means of targeting potential customers more precisely and as a tool for tipping the balance of bargaining power in their favor. As such, detailing affects physician behavior and increases the likelihood that physicians will prescribe the detailers' (more expensive) drugs." (emphasis added)); *Williams v. Bristol-Myers Squibb,* Co., 85 F.3d 270, 273 (7th Cir. 1996) ("Federal law requires a maker of prescription drugs to have a samples control program designed to prevent its salesmen, who frequently give free samples to the physicians they call on, from distributing prescription drugs outside authorized channels."); *Sun Ray Drug*, 320 F.2d at 74 ("efforts on the part of its detail men (who are salesmen)"); *Beale v. Biomet, Inc.*, 492 F. Supp. 2d 1360, 1377 (S.D. Fla. 2007) ("In each of these cases, the courts found that the drugs were overpromoted by salesmen known as 'detail men,' who visited physicians' offices and encouraged physicians to prescribe the drug."); *Skill v. Martinez*, 91 F.R.D. 498, 508 (D.N.J. 1981) ("comments by drug "'detail men' (drug salesmen who visit physicians)"); *Smith, Kline & French Lab. v. State Tax Comm'n*, 403 P.2d 375, 378 (Or. 1965) ("By soliciting the stocking of plaintiff's products by druggists and the prescription of those drugs by physicians, plaintiff's detail men perform the same sales function in plaintiff's field that salesmen soliciting actual orders from the ultimate user perform in other businesses.").

> Promotes use of and *sells* ethical drugs and other pharmaceutical products to physicians, [dentists], hospitals, and retail and wholesale drug establishments, utilizing knowledge of medical practices, drugs, and medicines: Calls on customers, informs customer of new drugs, and explains characteristics and clinical studies conducted with drug. Discusses dosage, use, and effect of new drugs and medicinal preparations. Gives samples of new drugs to customer. Promotes and *sells* other drugs and medicines manufactured by company. May sell and take orders for pharmaceutical supply items from persons contacted.

D.O.L. Dictionary of Occupational Titles § 262.157-010 (4th ed. 1991) (emphases added). Likewise, although it emerged in a different context, we find Judge Posner's observation in *Yi v. Sterling Collison Centers, Inc.*, 480 F.3d 505, 510-11 (7th Cir. 2007), informative—while it is "possible for an entire industry to be in violation of the [FSLA] for a long time without the Labor Department noticing[, the] more plausible hypothesis is that the . . . industry has been left alone" because DOL believed its practices were lawful.

**[12]** In view of many similarities between PSRs and salespeople in other fields, pharmaceutical industry norms, and the acquiescence of the Secretary over the last seventy-plus years, we cannot accord even minimal *Skidmore* deference to the position expressed in the *amicus* brief. Under *Skidmore*, "[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (internal citations omitted); *see also League of Wilderness Defenders v. Forsgren*, 309 F.3d 1181, 1189 (9th Cir. 2002) (quoting *Skidmore*, 323 U.S. at 140) (internal quotation marks omitted). Many, if not all,

of these hallmarks of "respectful" deference are absent here. The about-face regulation, expressed only in ad hoc *amicus* filings, is not enough to overcome decades of DOL nonfeasance and the consistent message to employers that a salesman is someone who "in some sense" sells. Moreover, we are unable to accept an argument that fails to account for industry customs and emphasizes formalism over practicality, in particular the argument that "obtaining a commitment to buy" is the *sine qua non* of the exemption. Under the Secretary's view, "sale" means unequivocally the final execution of a legally binding contract for the exchange of a discrete good. In addition to the point that such stringent wording is not found in Section 3(k), or plausibly implied from phrases like "other disposition," the Secretary's approach transforms what since the time of *Jewel Tea* has been recognized as a multi-factor review of an employee's functions into a single, stagnant inquiry.

Telephones, television, shopping malls, the Internet and general societal progress have largely relegated the professional pitchman embodied in *Jewel Tea* to the history books. But selling continues, and, as in prior eras, a salesperson learns the nuances of a product and those of his or her potential clientele, tailors a scripted message based on intuition about the customer, asks for the customer to consider her need for the product, and then receives a commission when the customer's positive impression ultimately results in a purchase.

[13] For the past seventy-plus years, selling in the pharmaceutical industry has followed this process. PSRs are driven by their own ambition and rewarded with commissions when their efforts generate new sales. They receive their commissions in lieu of overtime and enjoy a largely autonomous work-life outside of an office. The pharmaceutical industry's representatives—detail men and women—share many more similarities than differences with their colleagues in other sales fields, and we hold that they are exempt from the FLSA overtime-pay requirement.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's summary judgment for Defendant-Appellee SmithKline Beecham Corporation.

**AFFIRMED.**